EARLE J. BERNHEIMER, JR., by his Next Friend EARLE J. BERNHEIMER, SR., Plaintiff-Appellant, v. THE FIRST NATIONAL BANK OF KANSAS CITY, MISSOURI and GEORGE K. BAUM as Trustees of the Trust Estate Created Under and by Virtue of the Will of BERTHA C. BERNHEIMER, Deceased; JEWISH MEMORIAL HOSPITAL ASSOCIATION (Sometimes Known as MENORAH HOSPITAL ASSOCIATION), a Corporation, and CONGREGATION B'NAI JUHUDAH, a Corporation, Defendants-Appellants, EARLE J. BERNHEIMER, SR., Individually; EARLE J. BERNHEIMER, SR., as Trustee Under and by Virtue of the Will of BERTHA C. BERNHEIMER, Deceased; and ROBERT M. ZEHRING, Guardian ad litem for the Unborn Lawful Issue of EARLE J. BERNHEIMER, SR., Defendants-Respondents, No. 40443—225 S. W. (2d) 745.

Court en Banc, December 12, 1949.

Rehearing Denied, January 9, 1950.

*Walter A. Raymond, Daniel S. Millman* and *Gold & Needleman* for appellant Earle J. Bernheimer, Jr., pro ami.

1122

*John W. Oliver* for respondent Robert M. Zehring, Guardian ad Litem for the unborn lawful issue; *Butler Disman, Irvin Fane* and *James H. Ottman* for respondent-appellant Congregation B'Nai Juhudah; *Johnson, Lucas, Graves & Fane* of counsel. *Paul R. Stinson, Dick H. Woods* and *Albert Thomson* for respondent-appellant Jewish Memorial Hospital Association; *Stinson, Mag, Thomson, McEvers & Fizzell* of counsel.

1124

1126

*Samuel W. Sawyer, James F. Walsh* and *Horace F. Blackwell, Jr.,* for respondents The First National Bank of Kansas City and George K. Baum, Trustees.

John W. Oliver for respondent Robert M. Zehring, Guardian ad Litem for the unborn lawful issue.

ELLISON, J.—This is a proceeding under the Declaratory Judgment Act, Sec's 1126-1140, R. S. 1939, Mo. R. S. A., brought by the plaintiff-appellant Earle J. Bernheimer, Jr., a minor now about eight years old, through his father, Earle J. Bernheimer, Sr. as next friend, to establish plaintiff's status as the "lawful issue of the body" of his said father, within the meaning of the will of the latter's mother, Bertha C. Bernheimer, deceased. The suit involves personalty worth about $750,000 in a testamentary trust in favor of the father for life, remainder to his said issue.

The plaintiff is an only child, and the principal question in the case turns on whether he was born in lawful wedlock, or is illegitimate because of an alleged void divorce obtained by his father from a former wife before he married the plaintiff's mother. [In fact two divorces and two marriages are involved.] Other questions presented are: (1) whether plaintiff has any present interest in the testamentary trust which entitles him to maintain this declaratory judgment suit; (2) whether the testimony of the scrivener was admissible, as to what Mrs. Bernheimer said her objectives were in making the will; (3) whether the case should be adjudged under the law of California, where plaintiff's parents resided when he was born, or under the law of Missouri where the testatrix lived and died and made her will; (4) and whether attorney fees should be paid out of the trust fund to the counsel for the several parties.

1128

On the facts. Mrs. Bernheimer's will was dated September 7, 1937. The Bernheimer family had lived in Kansas City, Missouri for many years. The testatrix died there on December 18, 1937. The father, her son, had previously been twice married and divorced, and after the will was drawn but before the testatrix's death he had married a third wife, called Sally, on December 1, 1937. No living children were born of that and his two preceding marriages. He and Sally separated in April, 1941, and he went to Los Angeles, California, where he has ever since resided.

The latter part of April the father met Earle's mother, Verone Odegard, a night club singer. They became engaged in May, 1941, and Earle was begotten during that month. Verone knew of the father's previous marriage to Sally and of their separation. She learned of her pregnancy in June. The father brought a divorce suit against his wife Sally in Kansas City in September, 1941. But he could not obtain an early hearing therein, and the time for the birth of Verone's child was approaching. So he dismissed the Kansas City divorce suit against Sally on December 19, 1941, and brought another on the same day in Juarez, Republic of Mexico.

During its pendency Sally brought a suit in California against the father (and he appeared therein) to enjoin his prosecution of the Mexico divorce suit. But he nevertheless proceeded therewith and obtained an interlocutory decree of divorce from Sally on January 26, 1942. The father and Verone were married on February 5, 1942, in Las Vegas, Nevada, thereby making her his fourth wife, and four days later Earle was born on February 9. Later, on April 22, 1942, the California court granted a preliminary injunction against the father restraining him from prosecuting the Mexican divorce suit.

During the next eighteen months litigation ensued between Sally and the father over property rights and separate maintenance. A settlement of these was made in California in July, 1943, and Sally returned to Kansas City and brought a divorce suit in which she obtained a decree of divorce from the father on August 21. Her sojourn there lasted only a few days. About two weeks later on September 4, 1943, the father and Verone were remarried in Reno, Nevada. Thereafter Sally married a Mr. Cobb in February, 1945. So much for the underlying facts.

The instant suit was brought in April, 1944, and tried two years later. The trial court in a written opinion adjudged Earle was not the "lawful issue" of his father within the meaning of the will; that his rights thereunder must be determined by the law of Missouri, the domicile of the testatrix; that her intent must be ascertained from her will and not from extrinsic evidence, since the will is not ambiguous; that the Mexican divorce obtained by the father from his preceding wife Sally was void; and that the Kansas City divorce subsequently obtained by Sally from the father also was

illegal and void, because she was not then a *bona fide* resident of this State, as required by Sec's 1515, 1517, R. S. 1939, Mo. R. S. A. The conclusion of the trial court therefore was that since both divorces were void the father was still Sally's husband, in consequence of which his two Nevada marriages to Verone both were necessarily void under Sec. 3362, R. S. 1939, Mo. R. S. A., he having a living spouse, with the result that Earle is an illegitimate child and not the lawful issue of his father. And the court further held Earle's legitimation by his father under the law of California was immaterial, since his rights under the will must be governed by the law of Missouri, the domicile of the testatrix.

In a supplemental opinion filed three months later, the court stated that if the defendant trustees had demurred at the beginning of the case, the ruling would have been that the proceeding "only decides issues which might be moot" at the time of the father's death—this because if either he or Sally (now Mrs. Cobb) should in the future obtain a valid divorce from the other, and the father should remarry Verone and they should acknowledge Earle as their son, *then* he might be lawful issue of the father under the will in view of Sec. 315, supra. Or the father might obtain a divorce (from Verone?) and marry again and be survived by issue of that wife. But nevertheless, the court ruled in the exercise of its discretion, that since the case had been tried on the merits, and much time and money had been spent in taking depositions, the holding would be merely that *"at this time"* Earle is not the "lawful issue" of his father.

However, the court found in response to plaintiff-appellant's requested findings of fact: that Earle is the natural son and issue of the body of the father and mother, Verone; that ever since Earle's birth on February 9, 1942, his parents have lived and maintained their home together as a family unit in Los Angeles, California, believing in good faith that they are husband and wife in the eyes of the law; and that at all times since Earle's birth the father has claimed and publicly acknowledged him as his own natural son born of Verone. And the court further found that the second marriage of the father and Verone at Reno, Nevada on September 4, 1943, [after Sally had obtained the Kansas City divorce] was entered into by them in good faith, in the belief that the father was legally divorced from Sally and free to intermarry with Verone.

On the first question, as to whether the infant plaintiff has sufficient *present* interest in the trust estate to maintain this suit. Counsel for the trustees maintain he does not, because he may not survive his father and at best is now only prospective issue, or heir apparent of his father, whom he may predecease, citing a number of texts and decisions, with which we do not disagree, on their facts. But Part VII, par. 1 of Mrs. Bernheimer's will provides as follows (italics ours):

1130

"During the trust period, all the net income of the trust shall be paid monthly so far as practicable and in any event each three (3) months (from date of my death) to my son, if and so long as he shall live,—and *otherwise, or thereafter, to his issue,* or so far as deemed by the Trustees proper, *for the maintenance, education, welfare and advantage of my son's issue,* in equal proportions,—provided that if the same, in the judgment of the Trustees, be deemed approximately fair expenditures *to or for such issue or their maintenance, education, welfare and advantage* during the minority of all of said issue, need not by the Trustees be charged against such issue separately but 'may be charged against such issue collectively. And in making distribution of net income, the Trustees may distribute on the basis of ▮▮▮▮ income actually on hand or prospective, according to their judgment."

Counsel for the trustees argue that the words "otherwise or thereafter," first italicized above can only mean *after the death* of the father. We think the word "afterward" does refer to that time, but not so of the word "otherwise." The two words are in the disjunctive and the preceding lines of the paragraph have just provided for the payment of *all* the net income to the father during his life. But the provisions we have quoted say it may be otherwise, and that income may be paid "for the maintenance, education, welfare and advantage" of the father's issue in equal proportions; and that during the minority of the issue such payments may be made and charged to them collectively.

Furthermore, paragraph 4 of the same Part VII of the will continues (italics ours): "Notwithstanding any (if any) provisions of this instrument to the contrary,—during the trust, *but only after the death of my son,* each of my son's issue * * * " on attaining the ages of 25, 30, 35 and 40 years, respectively, shall receive a one-fourth part of his final share in the *corpus* of the trust. It seems to us these paragraphs recognize the father's "issue" in the sense of prospective issue, shall be entitled to receive income from the trust for maintenance, education, even during their minority, but not any of the corpus until after the father's death. We rule this issue against the trustees. Restatement, Future Interests, § 292c, p. 1547.

▮▮▮ On the admissibility of the testimony of the scrivener, a distinguished member of the Kansas City bar, since deceased. He testified the testatrix told him, in connection with the drafting of the "lawful issue" clause of the will, that the plaintiff's father had had many mistresses, and that she did not want her property to fall into the hands of any woman not of first class character or any issue of any such woman. Respondents say this testimony tended to show the testatrix meant the father's issue should be *begotten* and born in lawful wedlock. The trial court excluded the testimony from consideration, holding the intention of the testatrix must be determined

solely from the contents of the will itself, and the words used therein.

We hold the trial court ruled correctly in excluding the testimony. There is no ambiguity as to the identity of the person or property referred to in the will here involved. It is simply a question under the evidence·whether Earle was "lawful issue" of his father and that is a question of law. The written will cannot be impeached by proof of what the testatrix said her objectives were.[1] In the two cases[2] cited by respondents on that point both wills were ambiguous. In the Bond case a testator made a bequest to his "grandson William *N.* Bond", whereas he had no grandson of that name but did have one named William H. Bond. And in the will in the Kerens case a testamentary trust was complicated and susceptible of· two constructions, as to whether it was on a condition precedent or a condition subsequent.

The next questions are whether the infant plaintiff's status as lawful issue of the body of his father should be determined under the law of California or the law of Missouri, and what the law of the proper state is. Respondents contend the whole case must be adjudged under the law of Missouri because she and her family lived here, she made her will and died here, the plaintiff's father continued to live here for over three years afterward, and the property involved is personalty located here. There is considerable authority to support this contention. Restatement, Conflict of Laws, §296, p. 378, §308, p. 390; 69 C. J., §1111, p. 44; 15 C. J. S., §16g, p. 925; 11 Am. Jur., §§ 174-6, pp. 482-3.

Counsel for plaintiff agree the law of Missouri governs in determining what *class* of persons is contemplated by the phrase "lawful issue of the body" in the will. But they assert the question whether a particular person comes within that class, should be determined by the law of the jurisdiction where he acquired a personal status that would bring him into the general class, if not violative of our public policy—in this instance California, citing: 11 Am. Jur., supra, §175, p.\482; 10 C. J. S. § 8, p. 51, § 22, p. 1025; Annotations, 73 A. L. R., p. 941; 79 A. L. R., p. 91; Lund's Estate, 26 Cal. (2d) 472, 159 Pac. (2d) 643, 162 A. L. R., 614(8), 628, 632—all these three annotations by the same author.

But on examination it will be found the citations in the preceding two paragraphs generally concede that where the devolution of property, especially personalty, depends on the provisions of a *will* and not statutes of inheritance, the intention manifested by the will is

---

[1]Annotations, 94 A. L. R. 31, 34, 112, 114, 116, 119; Wooley v. Hays, 285 Mo. 566, 576-7(2, 3), 226 SW. 842, 844(2, 3), 16 A.L.R. 1; Neibling v. Orphans Home, 315 Mo. 578, 596(7), 286 SW. 58, 65(12); First Trust Co. v. Myers, 351 Mo. 899, 907(2), 914(5), 174 SW. (2d) 378, 380(4), 385.

[2]Bond v. Riley, 317 Mo. 594, 605(6), 296 SW. 401, 406(10); Kerens v. St. Louis Union Trust Co., 283 Mo. 601, 611, 612(1), 223 SW. 645, 646(1), 11 A.L.R. 288.

controlling as to both the general class and the status of the particular person. Sec. 568, R. S. 1939, Mo. R. S. A. And the will must be construed under the laws of the state where the testator resided, made it and died. We think the instant will and the surrounding facts disclose that it was written with the law of Missouri in mind.

In so holding we follow such cases as Krause v. Jeannette Inv. Co., 333 Mo. 509, 517(3), 62 SW. (2d) 890, 893(5), where the question was whether a husband was an "heir at law" of his childless and kinless deceased wife, under a testamentary trust in personalty. The decision ruled this court should apply the laws of Missouri in construing the trust, "because the instruments creating the trust estate were executed in Missouri, the parties lived in Missouri, and the trust is a Missouri trust."

Likewise, Zombro v. Moffett, 329 Mo. 137, 145 (4), 44 SW. (2d) 149, 153(3) held: "The general rule is that the construction of a will *for the purpose of ascertaining the testator's meaning and intention as expressed therein* is governed by the law of the testator's domicile, whether the will disposes of personal property or real estate (citing authority). This general rule is based upon the presumption that the maker of a will is more familiar with the law of his domicile than with the law of other jurisdictions, and that his will is written with the law of his domicile in mind." See also Jones v. Park, 282 Mo. 610, 628-9(6-8), 222 SW. 1018, 1022(4); Greenwood v. Page, 138 Fed. (2d) 921, 924(6-9).

■ Missouri has two legitimizing statutes, Sec's 315 and 316, R. S. Mo. 1939, Mo. R. S. A., both of which have been in force for over a century.[3] Sec. 315 has been construed[4] to mean that if a man have by a woman a child born out of wedlock, yet if he afterward enter into a *legal* marriage with her and recognize the child as his own, the child will thenceforward be legitimized, and this is true even though the child was conceived in iniquity. [Stripe case below.[5]] This statute can have no application here under the holding of the trial court, because the court ruled plaintiff's parents ■ had never been *legally* married since the father had never been legally divorced from his preceding wife Sally.

---

[3]Sec. 315: "If a man, having by a woman a child or children, shall afterward intermarry with her, and shall recognize such child or children to be his, they shall thereby be legitimated."

Sec. 316: "The issue of all marriages decreed null in law, or dissolved by divorce, shall be legitimate."

[4]Gates v. Seibert (Banc) 157 Mo. 254, 272, 278(6), 57 SW. 1065, 1068, 1070(3, 4), 80 A. S. R. 625; Bower v. Graham (Div. 1) 285 Mo. 151, 159, 225 SW. 978, 979(1); Busby v. Self (Div. 1) 284 Mo. 206, 214, 223 SW. 729, 731(2); Ash v. Modern Sand & Gravel Co., 234 Mo. App. 1195, 1206, 122 SW. (2d) 45, 51(8).

[5]Green v. Green (Div. 1) 126 Mo. 17, 22 (1), 28 SW. 752(1); Nelson v. Jones (Banc) 245 Mo. 579, 595-7(7, 8), 151 SW. 80, 84(12); Stripe v. Meffert (Div. 1) 287 Mo. 366, 390, 229 SW. 762, 769-770(3-5); Phillips v. Wilson (Div. 1) 298 Mo. 186, 199(3, 4), 250 SW. 408, 412(4, 5).

As to Sec. 316, while the section says the issue of all marriages "decreed" null in law shall be legitimate, it has been consistently held[5] that the statute does not literally mean the marriage must have been *declared* void by court decree, but only that the marriage was in fact void and could and would have been so decreed. And the same decisions further hold that if such marriage was entered into in good faith, even by one of the contracting parties and not both, the child will be deemed legitimate.

That being true, the infant plaintiff here is entitled to recover under Sec. 316, because the trial court expressly found in Finding of Fact 15: "That since Feb. 9, 1942, (the date of plaintiff's birth) plaintiff's father, Earle J. Bernheimer, Sr., plaintiff's mother, Verone Odegard Bernheimer, and plaintiff had lived together and have maintained their home together in Los Angeles, California, as a family unit, *believing in good faith that they were husband and wife in the eyes of the law.* * * * ". [Italics ours.]

This finding necessarily must have been based on the marriage of plaintiff's parents at Las Vegas, New Mexico, on February 5, 1942, shortly after the father's Mexican divorce and four days before plaintiff was born, for up to that time there had been no other marriage, common law or otherwise, to induce the belief that they were husband and wife. But the court refused another Finding 9, that "each" of the parties entered into that marriage in good faith believing the father was then legally divorced from his preceding wife Sally. The two findings, taken together, in effect say that both parties believed the Las Vegas marriage was valid, but one of them (the husband) had doubts about the Mexican divorce. The plaintiff's mother testified explicitly that she entered into the Las Vegas marriage believing it valid. And we find such to be the fact.

Respondents' brief contends the Stripe case, supra,[5] holds that when the legitimacy of a child is challenged under Sec. 316, the facts must show the child was *conceived* as well as born in the wedlock of a marriage which *both* parents believed to be legal but which in fact was void. We do not agree on either point. It is not the law in this state or generally elsewhere, that a child must be conceived as well as born in wedlock, else he will be a bastard and illegitimate. It was held in the Gates, Bower and Busby cases, supra,[4] that a child *"born in wedlock"* (not conceived in wedlock) is legitimate. And the Ash case, supra,[4] says the presumption of legitimacy is the strongest known to law. Many authorities agree. And under Sec. 316 it is not a question of good morals in the prior relations of the parents, but of filiation and the good faith of one of the contracting parties in the marriage before the birth of a child. The Stripe case, supra,[5] plainly holds that. See also: 7 Am. Jur., p. 629-30, §§ 5, 6; p. 636, § 14; p. 637, § 16: 10 C. J. S., p. 11, § 2; pp. 19, 22, § 3b: 7 C. J., p.

940, § 6; p. 948, § 19: Annotations, 84 A. L. R. 499, 506; 8 A. L. R. 428; L. R. A. 1916C, p. 725, notes 9, 10.

In the Stripe case the parents of the child involved had entered into a purported common law marriage when *both* parents knew the mother was the wife of another undivorced man, and there was also evidence that the father was the husband of another woman from whom he had not been divorced [287 Mo. l. c. 391, 229 SW. l. c. 771(6)]. In other words, there was an absence of good faith on the part of both parents.

That this Stripe case does not have the meaning attributed to it by respondents is further shown by the following fact. The author of that opinion was Small, C., who two years later wrote the opinion in the Phillips case, supra.[5] There, the plaintiff had been the admitted wife of one W. W. for seven years, when they separated without a divorce. Two months later W. W. entered into a common law marriage with the defendant, D. W., telling her he "was loose from his other wife," and that such marriage would be "good". They lived together as husband and wife for 13 years until his death leaving children of that second marriage, whose legitimacy was involved affecting a land title. The Phillips opinion held:

"Although a marriage may be unlawful, because either the man or the woman has another spouse living at the time of the marriage, from whom he or she was not divorced, still, if either one of them married in good faith, believing that death or divorce had removed all obstacle to their marriage, such marriage will be deemed voidable only, and not void, and the children of such a marriage are legitimate and may inherit, as legal heirs, the property of their parents [citing the Stripe case, 287 Mo. l. c. 388 et seq., 229 SW. l. c. 769 et seq. and the Green and Nelson cases, supra.[5]]

"Is there any susbstantial evidence in this case, that (D.W.), at the time she says she entered into the common-law marriage with (W.W.), supposed or believed in good faith, that he was divorced from his former wife? She says he told her that he was free or 'loose' from his former wife, and could enter into a lawful common-law marriage with her, although he never told her that he was divorced from his former wife, or that she was divorced from him. She was but an ignorant country girl at that time, about eighteen years old, and he was forty-seven years of age. She says she believed that he was free to marry her, as he said he was; if so, assuming that she knew the law, she must have believed that divorce had separated him from his first wife, although he did not say so in so many words. If this be true, which we must assume, she acted in good faith in entering into such marriage, and her children are legitimate."

As will be observed, in this Phillips case there was no pretense that the husband believed he had been divorced from his first wife. There was no record of any divorce. He merely *told* his second wife

two months after the separation that he was "loose" from the first wife, and she believed him and entered into an unrecorded common law marriage. On these slender facts the author of the opinion in the Stripe case held in the Phillips case that the second wife's children were legitimated. As bearing on her good faith, she was not required to have knowledge of any particular divorce proceedings or of the technical requirements of the law. And such is the general rule. Vesper v. Ashton, 233 Mo. App. 204, 211 (5), 118 SW. (2d) 84, 89 (8); 31 C. J. S., p. 760, § 132 (2); 22 C. J., p. 150, § 85; 20 Am. Jur., p. 223, § 229.

For the foregoing reasons we hold the infant plaintiff-appellant is lawful issue of the body of his father within the meaning of Mrs. Bernheimer's will under Sec. 316, R. S. 1939, Mo. R. S. A. And we furthermore agree he has a like status under the law of California because it is the same as the law of Missouri on the point involved. Consequently he qualified as such issue under the will although the intent thereof was founded on Missouri law. Sec. 85, California Civil Code, is substantially the same as our Sec. 316, reading: "The issue of a marriage which is void or annulled or dissolved by divorce is legitimate." And the courts of that state follow, it appears, the doctrine adhered to in Missouri, that the good faith entry of only one of the parents into such an invalid marriage is sufficient to legitimize the issue thereof. Estate of Shipp, 168 Cal. 640, 641, 144 Pac. 143; In re Filtzer's Estate (Cal. Sup.) 205 Pac. (2d) 377, 379 (3); 84 A. L. R., Annotation, 499, 501b.

The remaining question on this appeal is on the allowance of attorney fees to counsel respectively for: the infant plaintiff-appellant through his father as next friend; the father individually; the two respondent charities as residuary legatees; the guardian ad litem for unborn issue; and his attorney. The trial court allowed a fee of $6500 to the attorneys for the two testamentary trustees (excepting plaintiff's father) which is not challenged; $2500 to the guardian ad litem for unborn issue; and $10,000 to his attorney. These two fees are not questioned by the testamentary trustees, except as being excessive. But the court refused to make allowances for fees and expenses to the infant plaintiff and his father on the one hand, and the two charities on the other; and furthermore set aside expense allowances previously made to the plaintiff and the two charities by the Assignment Division of the circuit court at the beginning of the litigation, and ordered the money refunded.

The two respondent trustees in their brief here contend no attorney fees should be allowed to the plaintiff, his father and the two charities, because: (1) there is no ripe justiciable issue to be litigated, in consequence of which the trial court should have refused to exercise jurisdiction; (2) Mrs. Bernheimer's will is not ambiguous in its terms under Missouri law; (3) and the activities of plaintiff, his father

and the 'two charities in the litigation were self-serving and of no benefit to the trust estate. The trial court took that view of the matter. On this controversy over the allowance of attorney fees the respondent trustees cite the authorities first listed below.[6] The plaintiff, his father and the two charities as appellants rely on the authorities next following.[7] We have added to each list a few general authorities and/or later decisions.

On the first of the foregoing three points raised by the two trustees we have already held the infant plaintiff has sufficient interest in the trust estate to maintain this suit, because, if he be lawful issue of the body of his father he is presently entitled to maintenance, education, etc., from the income of the trust estate, so far as the trustees deem proper. In other words, his status as such is a question ripe for judicial determination now.

On the second point, that the will must be ambiguous in its *terms*, the trustees rely on the First Trust, Kern, Trautz and Sandusky cases, supra.[6] On the third point, that the litigation must not be merely self-serving and of no value to the trust estate, the trustees again cite the Kern and Trautz cases, and also the Kaltenbach, Fitch and Colket cases. The Kaltenbach case held the *plaintiff* in a suit to construe, and not to defeat, an ambiguous will be allowed an attorney fee out of the estate (there was no trust there), but no such allowances will be made to the *defendants* except where their efforts result in real benefit to the estate. The Fitch case held by implication that no attorney fee will be allowed even to a trustee's attorney unless his efforts increased or protected the trust funds. And the Trautz and Colket cases (C. C. A.) ruled that when the litigation essentially is between adversary claimants, no attorney fees will be allowed

---

[6]Annotations: 49 A. L. R. 1161; 79 A.L.R. 524, 536; 107 A.L.R. 756; 142 A.L.R. 1470; 143 A.L.R. 750. Colket v. St. L. Union Trust Co. (8th Cir.) 52 Fed. (2d) 390, 396(6); St. L. Union Trust Co. v. Fitch, 354 Mo. 638, 643(3), 190 SW. (2d) 215, 217(3); St. L. Union Trust Co. v. Kaltenbach, 353 Mo. 1114, 1123(5), 186 SW. (2d) 578, 583(14-16); St. L. Union Trust Co. v. Kern, 346 Mo. 643, 655(4), 142 SW. (2d) 493, 499(6-9); Marr v. Marr, 342 Mo. 656, 664(4), 117 SW. (2d) 230, 234 (7-9); Trautz v. Lemp, 334 Mo. 1085, 1094 (1, 2), 72 SW. (2d) 104, 107(1, 2); Harnett v. Langan, 282 Mo. 471, 489(4), 222 SW. 403, 406(6); Sandusky v. Sandusky, 265 Mo. 219, 232, 177 SW. 390, 394(5); First Nat'l Bank of K. C. v. Blocksom (Mo. App.) 217 SW. (2d) 296, 301 (3-5); First Trust Co. v. Myers, 239 Mo. App. 403, 408(6), 188 SW. (2d) 519, 522.

[7]4 Page on Wills (Lifetime Ed.) p. 609; 2 Perry on Trusts (7th Ed.) § 899, p. 1517; 65 C. J. § 583, p. 718, § 585, p. 722; 69 C. J. §§ 2072-4, pp. 905-8; 54 Am. Jur. § 636, p. 491; 57 Am. Jur. § 1033, p. 669. Lang v. Miss. Valley Trust Co. (Mo. Div. 2) No. 41262, 359 Mo. 688, 223 SW. (2d) 404; Young v. Pressgrove, 355 Mo. 204, 210(3), 195 SW. (2d) 516, 519(6); Garrison v. Garrison, 354 Mo. 62, 73(4), 188 SW. (2d) 644, 649(6); Kingston v. St. L. Union Trust Co., 348 Mo. 448, 458(7), 154 SW. (2d) 39, 43(7); City of St. Louis, Trustee v. McAllister, 302 Mo. 152, 158(1), 160(3), 257 SW. 425, 426(1), 427(3); Rice v. Hawley, 239 Mo. App. 901, 911(7), 203 SW. (2d) 158, 163(7); Lang v. Taussig (Mo. App.) 194 SW. (2d) 743, 748(2-7).

them out of the trust estate, even though the incidental effect may be to settle the status of the trust.

Counsel for the trustees further cite by way of analogy First Trust Co. v. Myers, 351 Mo. 899, 907(2), 174 SW. (2d) 378(4), holding the words "lawful heirs" in a will do not create an ambiguity, latent or patent, but are as certain as any words in the English language can be. And a recent ▮▮▮ case, Kindred v. Anderson, 357 Mo. 564, 575(3), 209 SW. (2d) 920(6) held the words "die without issue" included " a child either natural born or adopted", in view of Sec. 9614, which provides an adopted child shall "be deemed and held for *every purpose*, the child of its parent or parents by adoption, *as fully as though born to them in lawful wedlock,* except where the property is *expressly* limited to '*heirs* of the body.' " (Italics ours)

Summing up, the trustees assert the phrase "lawful issue of the body," appearing in Mrs. Bernheimer's will, has a definite meaning in law, is not ambiguous, and that inherently nothing is left to construction. Plaintiff's counsel agree the phrase has a fixed legal meaning as to the *class* of beneficiaries designated thereby, but say it permits the introduction of evidence showing whether plaintiff belongs in the class.

Counsel for the two charities and the guardian for unborn issue maintain the phrase "lawful issue of the body" is ambiguous, citing Freund v. Schilling, 222 Mo. App. 901, 905(3), 63 SW. (2d) 673, 675(3), which in turn referred to U. S. D. & T. Co. v. Dudley, 104 Maine 297, 306 (1), 72 Atl. 166. Both decisions did hold: "The word 'issue' as used in wills is an ambiguous term." But neither of these cases held the word was ambiguous in its general meaning of *lineal descendants.* The question in both was whether the issue took per capita or per stirpes under the meaning of the wills involved. We hold the term "lawful issue" plainly signifies heirs of the body or lineal descendants unless there be something in the context or extraneous circumstances disclosing a contrary intent. 69 C. J. §1223, p. 195, § 1251; p. 219.

Looking to the authorities cited by plaintiff, his father and the two charities, supra.[7] Page on Wills and Perry on Trusts both state the familiar doctrine that a trust estate should bear the expense of its own administration. In the St. Louis-McAllister case attorney fees were allowed counsel for both parties, where the *cy pres* doctrine was applied to a charitable trust in favor of (quoting substantially) "poor emigrants bona fide bound westward through St. Louis," and it had become impossible to identify such persons. In the Young case, the plaintiffs and defendants both claimed title to trust real estate by separate conveyances from the same insane grantor. The defendants brought the grantor into the case as intervenor by guardian ad litem, renounced their own title claim as against him, and caused their counsel to assist intervenor, who prevailed as against both parties. It was

held the fee of defendants' counsel was chargeable to the intervenor's estate. But there is no mention in the opinion or briefs of any ambiguity in either conveyance. The fee claim was based solely on the "protection" afforded the property involved.

Both the Garrison and Kingston cases involved the rights of contingent remaindermen and/or alleged vested remaindermen under complicated wills and facts, and both suits were brought by claimants thereunder (not a trustee). Both opinions held the provisions of the wills permitted of a *"legitimate dispute"* (italics ours) as to the meaning and effect thereof, and both held the claimants were entitled to an allowance of attorney fees out of the trust estates.

The recent Lang-Mississippi Valley case [223 SW. (2d) 404, 408(3)] was an action by remaindermen against a life tenant entitled to the income from the trust real estate, and the testamentary trustee. The land had been sold under court decree as wasting and unproductive. The defendant life tenant claims a substantial portion of the sale proceeds, on the theory that taxes and expenses which should have been paid out of the corpus or principal during the wasting period, actually were paid out of income rightfully due her, and she also claimed reimbursement for loss of income during that period. The opinion rejected these contentions of the life tenant, but nevertheless upheld an allowance of attorney fees to her, the remaindermen and the trustee. On that point the ruling was, that while the litigation ▮▮▮ was adversary as between the life tenant and the remaindermen, yet a determination of the issues was beneficial to the trust estate, and furnished a guide to all concerned. There was no claim of ambiguity in the will in that case. It turned on questions of law arising out of the impact of unanticipated subsequent events in the National depression of the " '30's".

The contention of the two trustees that there must be ambiguity in the *terms* of a will to warrant the granting of attorney's fees to counsel for the several parties in a suit to construe it, implies the ambiguity must be patent. But it is a matter of judicial knowledge that such ambiguities often are latent, arising on extraneous facts though the will be plain on its face. Also in many instances substantial and legitimate doubts as to the meaning and application of a will may be founded on the law alone, the meaning of statutes and decisions, etc., or on mixed questions of law and fact. But from whatever source the doubts arise, and whether the ambiguity be one of fact or of law, so to speak, the questions are of equal importance. For instance, in this case there is controversy on whether the meaning of the phrase "lawful issue of the body" in Mrs. Bernheimer's will, as applied to the infant plaintiff, should be interpreted under the law and statutes of Missouri or those of California, and what those statutes mean. And as we have held, there is also a determinative question of fact as to whether the mother of the infant plaintiff be-

lieved his father had been legally divorced from his preceding wife Sally.

Yet two of the three trustees named in the will refused to bring a suit to construe it, or at least did not do so, leaving that to the third trustee, plaintiff's father. Thus the ultimate issues were raised, but the two trustees still refuse to take a position on the merits, saying only the will is not ambiguous under Missouri law. These ultimate issues have been fought out by the plaintiff, on the one hand, and the two charities and the guardian ad litem for unborn issue and his attorney, on the other. All of them have acted in good faith and are vitally interested. But the questions are also important to the testamentary trustees in ascertaining the meaning of the will, and in charting a course for the administration of the trust estate. In the opinion of the writer these adversary parties are entitled to an allowance of attorney fees and taxable court costs, but not for personal expenses. The issues give rise to a ''legitimate dispute'' within the meaning of the Garrison and Kingston cases, supra, and the court may exercise a ''sound discretion'', within the meaning of the Kern case.

But these fees cannot be based alone on the whole amount of the trust fund, $750,000. Except as to the amount the trustees may in their discretion allow the infant plaintiff for maintenance, education, etc., out of the income of the trust fund, he now has no fixed interest in it. He may predecease his father, or the father may have other issue. The two charities will receive nothing unless the father die without issue. The trial court pointed to these facts in its opinion. The court also stated counsel for plaintiff and his father, jointly, would be entitled to a fee of $20,000, if anything, and counsel for the two charities, jointly, the same amount, but denied them any allowance at all because of their adversary self-interest. Considering these facts we think a reasonable allowance in each instance would be $10,000 jointly, the same as the allowance to the attorney for the guardian ad litem for unknown issue, along with taxable court costs.

For the reasons stated the judgment is reversed and the cause remanded with directions to enter a new judgment or decree in conformity herewith. All concur.