**Geneva Leona SIMPSON, Plaintiff-Respondent,**

v.

**George E. BLACKBURN, Clarence D. Blackburn, William Russell Blackburn, Grace M. Kezer, James Merlin Kelsick, Individually and as Administrator of the Estate of Omer Creighton Blackburn, Estate No. 1144, In the Probate Court of Audrain County, Missouri, Defendants-Appellants.**

No. 32735.

St. Louis Court of Appeals.

Missouri.

April 18, 1967.

Don C. Carter, Sturgeon, Paul W. Bennett, Vandalia, for appellants.

Granville Collins, Fulton, William W. Van Matre, Jr., Van Matre & Van Matre, Mexico, for respondent.

CLEMENS, Commissioner.

This law suit is an effort by plaintiff Geneva Leona Simpson to be declared an heir of Omer C. Blackburn, who plaintiff claims was her great uncle. The trial court found for plaintiff, and the defendant administrator and other heirs appealed to the Supreme Court, asserting that the issue involved plaintiff's claim to a one-seventh share of a $200,000 estate. The transcript did not affirmatively show the value of the

estate, and the Supreme Court transferred the case to this court.

Two-sevenths of Omer C. Blackburn's estate will pass to the heir or heirs of his deceased brother, John A. Blackburn. John A. Blackburn left one daughter, defendant Grace M. Kezer. His only son, Clark P. Blackburn, predeceased him. Plaintiff claims she is the legitimated, adulterine bastard child of Clark Blackburn, her mother's paramour, whom her mother later married. The defendants contend plaintiff is the child of James Cecil Gilman, to whom plaintiff's mother was married at the time of plaintiff's birth.

The ultimate issue is one of law: Is plaintiff an heir of Omer C. Blackburn? That turns on the factual issue of her paternity. If plaintiff is the child of James Gilman, husband of her mother when plaintiff was conceived and born, she is not a Blackburn heir. But if plaintiff is the actual and recognized child of Clark Blackburn, her mother's paramour, then plaintiff is an heir of Omer C. Blackburn.

■ To establish this claimed status, plaintiff relies on § 474.070 V.A.M.S. It declares that if a man has a child by a woman whom he afterward marries and recognizes the child to be his, the child is thereby legitimated. This statute applies not only to a child born out of wedlock, but also to a child, like plaintiff, born in wedlock but sired by a man who was not her mother's husband. Nevins v. Gilliland, 290 Mo. 293, 234 S.W. 818[4]. The three essential elements of such legitimation are actual paternity, intermarriage and recognition. Lowtrip v. Green, 363 Mo. 619, 252 S.W.2d 524[1]. The defendants concede these legal principles but contend, primarily, that the evidence is insufficient to show that Clark Blackburn was the plaintiff's father. Defendants invoke "the strongest presumption known to the law": that a child born in wedlock is the child of the marriage. Bernheimer v. First Nat. Bank of Kansas City, 359 Mo. 1119, 225 S.W.2d 745[10].

With these principles of law to be applied to the facts of the case, we shall detail the evidence.

■ We first note the scope of our appellate review. We must view the case upon both the law and the evidence, weigh the evidence, and render such judgment as the trial court ought to have given. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the witnesses' credibility. Civil Rule 73.01(d), V.A.M.R. The trial judge was steeped in the atmosphere of the trial, saw and heard the witnesses, heard the arguments of counsel, and was in a position to interpret and appreciate the evidence with all its shades of meaning better than we can do merely by reading and studying a written report of it. He had in his presence the living thing; we have but a dead image of it.

Plaintiff's mother, nee Laura McNanny, married James Gilman in 1921. They lived on a rented farm in Callaway county. Laura testified that she ceased having marital relations with her husband in 1922 and in 1924 began an adulterous relationship with a neighbor, Clark Blackburn. Laura became pregnant and left her husband. Seven months after the separation Laura gave birth to plaintiff, on April 6, 1925. Then seven months after the birth, Laura was divorced from James Gilman; four days later she and Clark Blackburn were married. Details of this part of the case will be developed later, after we relate the evidence concerning Clark Blackburn's recognition of plaintiff as his daughter.

Clark Blackburn and Laura were married and lived together from November 11, 1925, until he was granted a divorce from her in 1934. A month or so after their marriage Clark and Laura Blackburn took plaintiff, then eight months old, to the farm home of his parents, John A. and Sally Blackburn. Laura testified this was done because Clark was nervous around children. Some arrangement for plaintiff's perman-

ent care was made, and plaintiff thereafter made her childhood home with John and Sally Blackburn.

During her childhood the plaintiff was verbally acknowledged as Clark Blackburn's daughter by him and by his parents, and at times by his only sister, defendant Grace Kezer.

Plaintiff's name "Geneva Leona Blackburn" is consistent with her claim of recognition by Clark Blackburn. The name "Geneva Blackburn" was used when plaintiff started school. Plaintiff's original birth certificate showed only the surname "Gilman." Then in 1938, when plaintiff was thirteen years old, the name "Geneva Leona" was added to her birth certificate. (The documentary evidence to support this addition had been destroyed.) "Geneva Leona" was the same name Clark Blackburn had given several years before to a previous daughter who died in infancy. Next, in 1944, a new birth certificate was issued showing plaintiff's name as "Geneva Leona Blackburn." This certificate was issued on the strength of Clark Blackburn's affidavit of July 11, 1944, whereby he swore: "I further certify that Geneva Leona Blackburn was born April 6, 1925, and that I am her father."

Plaintiff offered other documentary evidence to show recognition. In 1934, when plaintiff was nine years old, Clark Blackburn sued Laura for divorce. In his verified petition he stated that one child, Geneva Leona Blackburn, had been born of the marriage and was being reared by his parents. He prayed for her custody. At the divorce trial Clark Blackburn testified to his paternity of plaintiff as he had alleged in his petition. By the decree, Clark was divorced from Laura and granted custody of the child. By Clark Blackburn's will, executed in 1938 and probated in 1949, he bequeathed one dollar "to my daughter, Geneva Leona Blackburn." By then Clark had divorced Laura and married Nellie Martin, to whom he left the residue of his estate. The defend-

ants showed that a month before his death in 1949, when plaintiff was twenty-four years old, Clark Blackburn executed another affidavit. Therein he accused plaintiff of "making trouble" for his family and denied he had ever recognized or claimed her as his daughter.

So much for Clark Blackburn's own conduct showing recognition of plaintiff as his daughter. As said, his family participated in this recognition. They usually spoke and referred to one another by such family names as "Daddy," "Grandfather," "Grandmother," and "Aunt Grace." Plaintiff was usually spoken of as "my daughter," "our granddaughter" or "Clark's daughter." Evidence of other conduct of the Blackburn family bears out plaintiff's claim of recognition as Clark Blackburn's daughter.

For nine years plaintiff went to the Fulton public schools under the name of Geneva Blackburn. The records showed "Parent or Guardian—John A. Blackburn." Then in 1938 plaintiff moved to Wellston to the home of defendant Grace Kezer, who enrolled her in high school. Added information on the Wellston school records showed Laura's parents were "C. P. and Laura Blackburn," and that she was living with "Grace M. Kezer—aunt," at 6335 Wellsmar avenue. Mrs. Kezer denied giving this information to the school and denied referring to plaintiff as her niece.

On three occasions before this lawsuit plaintiff participated without objection in probate proceedings as an heir of the Blackburn family. The first probate proceeding concerned the will of John A. Blackburn, Clark's father. By his will, executed and probated in 1948, John A. Blackburn gave land and money "to my great grandsons," named children of plaintiff. He also gave plaintiff a dwelling for use during the minority of one of her children. Next, there were probate proceedings of the will of Clark Blackburn, previously mentioned. In applying for letters testamentary in 1949, Clark's widow, Nellie Blackburn, named plaintiff as his daughter. Last, in 1955

Maude O. Hazlett died intestate. She was predeceased by her sister, Mrs. John A. (Sally) Blackburn, mother of Clark Blackburn, also deceased. On information given to the administrator by someone, he listed Grace Kezer as the daughter and only living child of Sally Blackburn and plaintiff as the daughter and only child of Clark Blackburn, deceased son of Sally Blackburn. With Grace Kezer's knowledge of this information, she and plaintiff shared equally in one-tenth of the distribution of Maude Hazlett's estate.

Defendant Grace Kezer and three other witnesses testified to conversations with Clark Blackburn in which he said plaintiff was not his child. These conversations were somewhat vague as to times and circumstances. At least part of them were made after the apparent breach of relationship between Clark Blackburn and the plaintiff that had occurred when he made his last affidavit in 1949, a month before he died. These statements were offset by ten other witnesses who testified for plaintiff. They quoted Clark Blackburn's and other Blackburns' statements referring to plaintiff as Clark and Laura's daughter.

This was the evidence of Clark Blackburn's recognition of plaintiff as his daughter. As said, the three elements of legitimation are actual paternity, intermarriage and recognition. We go now to evidence of actual paternity.

Plaintiff's mother, now Laura Elsenrath, testified in detail about her marital relations with her first husband, James Gilman, and her adulterous relations with Clark Blackburn. The substance of her testimony follows. When eighteen years old Laura married James Gilman, in March of 1921. Just a year later Laura gave birth to a stillborn child. She denied having sexual relations with her husband, James Gilman, after that time. She explained this was because "he was a man of self-abuse" and "didn't have much use for a woman." After this stillbirth Laura continued to live with her husband in their farm home, but they occupied separate bedrooms. Two

years after the stillbirth Laura and a friend of hers, Agnes Counts, met Clark Blackburn, a 30-year-old widower who lived alone on another farm in the neighborhood. This was in the spring of 1924. Laura and Clark began meeting clandestinely and having intercourse one or twice a week. She told her husband she was in love with Clark Blackburn. On July 4, 1924, Laura and Clark Blackburn were at a picnic and later went to his house and had intercourse. Laura's menstrual periods ceased soon thereafter. The next month Laura left Gilman's home and moved to her mother's home nearby. There she gave birth to the plaintiff on April 6, 1925, nine months and two days after the July 4th act of intercourse at Clark Blackburn's house. Clark Blackburn paid the medical expenses of the delivery. Laura had previously told James Gilman of her pregnancy and asked him for a divorce. In July, 1925, when plaintiff was three months old, Laura filed suit against James Gilman, and was divorced from him on November 7, 1925. Clark Blackburn made all the arrangements for the divorce with a Fulton lawyer and paid all the expenses. Custody of "Geneva Gilman" was awarded to Laura, who had neither asked for nor received child support from James Gilman. Four days after the divorce Laura and Clark Blackburn were married.

On cross-examination Laura was confronted with the 1925 divorce records. In the verified petition she had alleged her own good demeanor, her husband's misconduct, including false accusations of her associating with other men, and that a female child, Geneva Gilman, was born of the marriage. Laura explained the petition by saying Clark Blackburn had made prior arrangements for the divorce with a Fulton lawyer, that the petition was already prepared and signed by counsel when Clark Blackburn took her to the lawyer's office, and that she signed the acknowledgment without reading the petition.

Preparatory to cross-examining Laura at the present trial, counsel for the defendants

began a search for the record of her testimony in the 1925 Gilman divorce trial. They learned that the court reporter had been Howard B. Lang, later Probate Judge of Boone county. His old stenographic notes were finally unearthed and then transcribed by Judge Lang. The accuracy of the transcript was not questioned. It was introduced to impeach Laura's present testimony that Clark Blackburn, rather than James Gilman, was plaintiff's father. Laura had previously testified that the main trouble with her husband was that "he accused me of other men when I wasn't guilty." She had answered no to leading questions about keeping company with other men. At this trial Laura admitted that she had lied in 1925. She gave two excuses: she had not associated with other "men" but only with one man, Clark Blackburn; she had been told by Clark Blackburn and the lawyer how she should testify, and was warned by them that she would get the divorce only if she did so.

Laura's testimony of her adulterous relationship with Clark Blackburn was partially corroborated by her erstwhile friend, Agnes Counts, who testified she was with Laura when Laura first met Clark Blackburn in the spring of 1924. She knew Laura and Clark were together frequently, particularly at his house on the afternoon of the 4th of July picnic. Soon after this Laura told Agnes Counts that she was pregnant with Clark Blackburn's child.

Laura's former husband James Gilman testified for the defendants by deposition. At the time his deposition was taken he had been a patient in a county nursing home for three years. He was vague about names and dates, and some of his answers indicated he did not fully understand the questions. The only significant testimony concerned his marital relations with Laura. He was sure he and Laura had had only one child, who died at birth. Three times James Gilman answered that he never had sexual intercourse with Laura after the birth of the stillborn child (April 10, 1922). Later, in response to a leading question, he

answered that he and Laura did have sexual intercourse up to the time of their separation (August 31, 1924). Gilman further said the stillborn child was Laura's last pregnancy by him. He said he had been aware of Laura's associating with Clark Blackburn during their marriage, and added that "everyone" knew Geneva was Clark Blackburn's child.

Other evidence of plaintiff concerned the similar appearance of Clark Blackburn and plaintiff's children. Two adult photographs of Clark Blackburn do bear a striking resemblance to photographs of two of plaintiff's children. Considering that Clark Blackburn would, at best, be only one of the four grandparents of plaintiff's children, this evidence is of limited value.

In reaching our conclusion herein we shall consider the defendants' contentions that plaintiff is presumed to be the lawful child of her mother's husband, James Gilman, and their contentions that the evidence does not support plaintiff's claims that Clark Blackburn is in fact her father and that he recognized her as his daughter. Counsel have cogently presented their contentions of the law and evidence. We are indebted to them for forceful briefs and oral arguments.

## Presumption of Legitimacy

On virtually every page of defendants' brief they refer to the presumption of plaintiff's legitimacy: that having been born during the marriage of Laura and James Gilman, plaintiff is presumed to be Gilman's daughter. This presumption of legitimacy is of ancient origin and arose under the common law, when bastards were *nullius filii*, "the sons of nobody." The presumed legitimacy of a child born in wedlock was based upon broad principles of natural justice: the supposed virtue of the mother, and the protection of innocent offspring from the odium and disabilities of bastardy. 10 Am.Jur.2d, Bastards § 10. Missouri decisions attribute the purpose of the presumption to our courts' "righteous

zeal to protect the innocent offspring." Ash v. Modern Sand & Gravel Co., 234 Mo. App. 1195, 122 S.W.2d 45[6]; Watts v. Watts, Mo.App., 325 S.W.2d 40[2]. In our case no such purposes would be served by the presumption. This, because the mother confesses her immorality, and the daughter asserts her bastardy. In defendants' brief they invoke the presumption for a contrary purpose: "in order to prevent fraudulent claims, such as asserted in this case." They cite no authority for that theory, and we find none.

■ Because the defendants rely so strongly on this presumption of legitimacy, we must distinguish between conclusive presumptions, which are rules of substantive law, and rebuttable presumptions, which are rules of evidence. In the case of Terminal Warehouses of St. Joseph, Inc. v. Reiners, Mo., 371 S.W.2d 311[4], the court spoke of the oft-expressed view that a presumption disappears when substantial contrary evidence comes in, and added:

"* * * a presumption is a rule of law (unless it is a conclusive presumption, i. e., a rule of substantive law) which puts the burden of producing some substantial evidence on the party presumed against; but that when substantial evidence is adduced, the presumption disappears and the jury receives the issue free of any presumption. Of course, the facts which gave rise to the presumption in the first place remain in the case and those facts, as well as the facts to the contrary, are for the jury. Michler v. Krey Packing Co., 363 Mo. 707 [banc], 253 S.W.2d 136, 139 [1–4]."

■ We will consider the claimed presumption of plaintiff's legitimacy in the light of that principle. In the early history of law the presumption of legitimacy was conclusive—and thereby a matter of substantive law—but this is no longer so. Now it is a rebuttable presumption—and thereby a rule of evidence. Boudinier v. Boudinier, 240 Mo.App. 278, 203 S.W.2d

89[4]; F.——— v. F.———, Mo.App., 333 S.W.2d 320[10].

For this reason, courts' expressions about the presumption must be considered as comments on the quantum of the evidence— the evidence in the particular case under review. As said in Busby v. Self, 284 Mo. 206, 223 S.W. 729[1], this ancient doctrine "has been modified from time to time to conform to the circumstances of particular cases or the idiosyncrasies of particular judges." In Missouri decisions cited by the parties we find a broad variety of expressions about the quantum of evidence necessary to overcome the presumption: Drake v. Milton Hospital Ass'n, 266 Mo. 1, 178 S.W. 462 (clear and satisfactory proof that there was no sexual intercourse between the husband and wife); Ash v. Modern Sand & Gravel Co., supra (no judicial escape from such a malign conclusion); F.——— v. F.———, supra (clear and convincing evidence allowing no conclusion but that of illegitimacy); Needham v. Needham, Mo.App., 299 S.W. 832 (clear, convincing and satisfactory proof of no intercourse); Boudinier v. Boudinier, supra (sufficient weight and clarity to convince the triers of fact); Jackson v. Phalen, 237 Mo. 142, 140 S.W. 879 (strong and persuasive evidence leaving no reasonable doubt); Stripe by Shannon v. Meffert, 287 Mo. 366, 229 S.W. 762 (clear and convincing evidence of no intercourse by husband); and Bower v. Graham, 285 Mo. 151, 225 S.W. 978 (the presumption of legitimacy may be destroyed by showing the fact to be otherwise).

The defendants have cited seven Missouri cases stating the presumption that a child born during wedlock is legitimate. These must be considered in the light of the facts to which the presumption was applied. Not one of the cited cases concerned a child who asserted paternity by a man other than her mother's husband, as plaintiff does here. The cases of Watts v. Watts, supra, and F.——— v. F.———, supra, were divorce cases in which the presumption was applied against the husbands who denied

paternity. Thus, the presumption was applied in those cases to *protect* the innocent child from bastardy. In Jackson v. Phalen, supra, and Ash v. Modern Sand & Gravel Co., supra, each plaintiff made a claim that depended on his status as a legitimate child and showed he was born in wedlock. In each case the defendants denied the plaintiff's legitimacy, claiming someone other than the mother's husband was the father. In each case the court invoked the presumption of legitimacy arising from birth in lawful wedlock—again to protect the child from the disabilities of bastardy. Defendants cite two cases in which the presumption was stated but not applied, and was therefore obiter dictum: Stripe by Shannon v. Meffert, supra, and Drake v. Milton Hospital Ass'n, supra. Defendants' cited case of Needham v. Needham, supra, cited the presumption but did not follow it.

■ In view of the lack of uniformity in the decisions concerning the quantum of evidence to overcome the presumption, in view of the different factual situations in those cases, and in view of the fact that the protective purposes of the presumption are absent in this case, we shall view the evidence as in any other court-tried case, and determine whether the plaintiff has sustained her burden of producing substantial evidence to cause us to believe that Clark Blackburn was her father and recognized her as his daughter. In this we are sustained by the decision in a case remarkably similar on both the facts and the issue of actual paternity.

That case is Busby v. Self, 284 Mo. 206, 223 S.W. 729, decided in 1920. Two children, Lucy and Ezra, claimed to be the adulterine bastard children of Frederick Molesdale, although both were born in wedlock between their mother and *Isaiah* Molesdale. Isaiah Molesdale, of Lancaster, England, had a son, Frederick, by his first marriage, and his wife died. In 1857 Isaiah came to America with Frederick, then sixteen years old, and settled in Crawford county, Missouri. Frederick served in the army and in August, 1865, came to live with his father and family. Isaiah had married again, in 1863, to Louisa Jane Woods, a girl much younger than his son Frederick, and with whom Frederick had kept company before he enlisted in the army, and before she had married Isaiah. Isaiah operated a mill several miles from home and often remained there during the week. Frederick continued his affair with Louisa, his stepmother, and friction arose between the father and son concerning Frederick's association with Louisa. During this time Lucy and Ezra were born. Isaiah disowned Lucy and Ezra, claiming they were Frederick's children. Finally Frederick left Crawford county, taking Louisa and the two children, Lucy and Ezra, with him. He and Louisa lived together as husband and wife, and educated the two children. Later, Louisa somehow obtained a divorce from Isaiah and married Frederick. On trial in the inheritance case the court found that Frederick was the father of Lucy and Ezra. Thus, the facts and issues in Busby v. Self are readily comparable to our case; i. e., a a child was born during a lawful marriage as a result of the wife's adultery with a paramour, who later married the mother and recognized the child as his own. There, as here, each child was seeking to establish heirship to the actual father by virtue of § 474.070, V.A.M.S., which declares that if a man has a child by a woman whom he afterward marries and he recognizes the child, the child is legitimated. In upholding the legitimacy of Lucy and Ezra Molesdale as the children of Frederick Molesdale, the court said:

"The question is whether Ezra Molesdale * * * and defendant Lucy Johnson, were, under the provisions of section 341 of the Revised Statutes of 1909 [now § 474.070, V.A.M.S.] shown to be the legitimate children of Frederick Molesdale. The cause was tried by the appellants upon the theory that children born in wedlock are conclusively presumed to have been begotten by the husband until its impossibility is shown. This

ancient doctrine, borrowed from the civil law, has been modified from time to time to conform to the circumstances of particular cases or the idiosyncrasies of particular judges, but these modifications have frequently tended to defeat or impair one of the principal objects of the rule by the public exhibition in court of matters calculated to suffuse with blushes even the judicial cheek. The rule rested upon the preservation and encouragement of public morality, with incidental protection to the child born in lawful wedlock from the stigma of illegitimacy, and with no thought of the moral right that the innocent child might have against his guilty progenitor for the same protection. Nor did it take into consideration the subjection of the adulterine child to the tender mercies of a father forced upon it by law, and who would treat it as an interloper.

"The Legislature, which speaks as the mouthpiece of the public policy of the state, held all these things in careful consideration when it enacted this section. While it did not abate one jot in its condemnation of immorality, it looked broadly to the protection of the innocent and wronged and helpless child, giving the guilty [parents] an opportunity to redress, as far as possible, the wrong they had perpetrated against their own children, and the outraged husband the opportunity, without the duty, to surrender the result of his connubial shame to its natural protection. * * * So far as the guilty father is concerned, the marriage and recognition is equivalent to the adoption provided for by statute in other cases."

We revert now to the evidence in our case. The marriage between Clark Blackburn and Laura Gilman is admitted. This leaves the questions of Clark Blackburn's paternity and his recognition of plaintiff as his daughter. We first take up the question of recognition.

*Recognition*

The evidence demonstrates beyond doubt that over a period of twenty-three years Clark Blackburn did recognize the plaintiff as his daughter. According to Laura, Clark Blackburn paid for her confinement expense and arranged and paid for her divorce from Gilman. He married Laura four days later. According to his brother-in-law, Clark Blackburn named the plaintiff "Geneva Leona," the same name as a child of his who had died. By an agreement between Clark Blackburn and his parents, the plaintiff was reared in their home. At school and in the neighborhood she was consistently referred to by Clark Blackburn and his family as his and Laura's daughter. When Clark Blackburn divorced Laura in 1934, he asked for and was granted custody of plaintiff, then nine years old. In 1944 Clark Blackburn made an affidavit asserting his paternity of plaintiff to enable her to get a birth certificate under the name of Blackburn. In his 1938 will Clark Blackburn named plaintiff as his daughter, and later she participated in his and two other estates in the Blackburn family. Further, the testimony of James Gilman showed his own non-recognition of plaintiff as his daughter; he said everyone knew she was Clark Blackburn's daughter. As against all this, the defendants showed that plaintiff was not reared by Clark Blackburn but by his parents; and that Clark Blackburn had at three unspecified times verbally denied his paternity, and did so again in an affidavit made a month before he died in 1949. As urged by the defendants we have compared this evidence of recognition with that in the case of Lowtrip v. Green, 363 Mo. 619, 252 S.W.2d 524[5–8]. In that case there was strong evidence, much of it documentary, of non-recognition. The Lowtrip case does these defendants more harm than good. We hold that the evidence here powerfully demonstrated Clark Blackburn's prolonged recognition of plaintiff as his daughter.

## Paternity

It is more difficult to determine with confidence the critical issue of Clark Blackburn's actual paternity of plaintiff. For this we look to the testimony of her mother, that of James Gilman, and evidence of Clark Blackburn's conduct.

Laura's testimony of plaintiff's paternity falls into two parts: that Clark Blackburn was, and that James Gilman was not, plaintiff's father. During the time of plaintiff's conception, did Laura have sexual intercourse only with Clark Blackburn, or also with her husband James Gilman? The testimony of Laura and Gilman leaves no doubt that Laura and Clark Blackburn did have intercourse during that time. Clark Blackburn's conduct thereafter is consistent with his and Laura's adultery. The more crucial question is whether Laura and Gilman did not have intercourse. That they were married and living in the same house raises a strong inference that they did. Laura says not; that after the birth of her stillborn child she moved into a separate bedroom and never again had intercourse with Gilman.

Laura's present testimony that she did have intercourse with Clark Blackburn while married to Gilman is contradicted by her testimony in her 1925 divorce suit against Gilman. She then swore that Gilman had falsely "accused me of other men." Laura now admits she lied. She admits she signed the affidavit to the divorce petition saying that plaintiff was born of her marriage to Gilman, but she did not then testify that Gilman was plaintiff's father. Her statement that plaintiff was "born of the marriage" was her lawyer's language—as much a conclusion of law as a statement of fact. She now says the divorce petition and her testimony were dictated by Clark Blackburn, who, "made all the arrangements." Defendants contend—not without logic— that Laura's perjured testimony robs her present testimony of all credibility. The answer is not so simple.

We must consider that Laura's false testimony in 1925 may have been motivated by her desire to marry her paramour, and thereby relieve the innocent child of the stigma of her own iniquity by giving their child her proper name and status as the daughter of Clark Blackburn. We must remember, too, that we are passing on plaintiff's rights, not Laura's. Laura was the wrongdoer, not plaintiff. The crux of evaluating Laura's present testimony is whether she, as plaintiff's witness, is telling the truth *now* when she says she did not have marital relations with her husband during the period of conception. The trial court obviously did believe Laura's testimony. Although there were no findings of facts, the court's judgment in plaintiff's favor is consistent with belief—and inconsistent with disbelief—of Laura's present testimony. In assessing Laura's credibility the trial judge had a unique advantage. He could assess her sincerity, her frankness in relating her shameful conduct and acknowledging her previous false testimony, her reaction to piercing cross-examination, and all the other nuances of a witness's testimony that are apparent to a trier of fact but which disappear in the process of being filtered through the reporter's shorthand notes and typewriter into the transcript. Considered in the light of James Gilman's testimony and evidence of Clark Blackburn's conduct, Laura's present testimony is not incredible. So we must, and do, defer to the trial court on the question of Laura's credibility.

We look now to the deposition testimony of defendants' witness James Gilman. It is inconsistent as to the time he and Laura ceased marital relations. It will be recalled that Laura testified that after the birth of their stillborn child she moved into a separate bedroom and then ceased intercourse with Gilman, and that she moved out of their house two years later. Gilman testified positively that he and Laura had no intercourse after the birth of the stillborn child. Later he testified they had inter-

course until the time of their "separation." He was vague about the time of the separation, and it is not clear whether he was referring to the separate bedrooms or to Laura's actually moving out. On the whole, his testimony supports Laura's testimony that their marital relations ceased at the time of the stillbirth, long before plaintiff was conceived. This conclusion gains further support from Gilman's belief and repeated statements through the years that plaintiff was Clark Blackburn's daughter, not his own.

 We have now considered Laura's and James Gilman's testimony of plaintiff's paternity. We turn to the previously related testimony of Clark Blackburn's recognition of plaintiff as his daughter—as that recognition bears on the issue of his actual paternity. Implicit in that recognition is Clark Blackburn's belief that he did —and that James Gilman did not—sire Laura's child. Of course, Clark Blackburn could not know that James Gilman was not the father of Laura's child. (As Shakespeare told us in *The Merchant of Venice,* "it is a wise father that knows his own child.") However, recognition of a child as one's own is a "supporting fact" and tends to demonstrate actual paternity. Lowtrip v. Green, supra, 252 S.W.2d at l. c. 526; Bower v. Graham, supra, 225 S.W. at l. c. 980.

Considering then the testimony of Laura and James Gilman concerning Clark Blackburn's paternity of plaintiff, and the supporting testimony of Clark Blackburn's recognition of plaintiff as his daughter, the evidence causes us to believe that Clark Blackburn was—and James Gilman was not—the father of the plaintiff. Add to this our finding that Clark Blackburn recognized plaintiff as his daughter and the conceded fact that he married her mother, and the judicial result is that the trial court did not err in adjudging that plaintiff is the legitimated daughter of Clark Blackburn under § 474.070, V.A.M.S.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.