Donald L. DARR and Wanda J. Darr, Plaintiffs–Respondents,

v.

STRUCTURAL SYSTEMS, INC., Defendant–Appellant.

No. 52219.

Missouri Court of Appeals, Eastern District, Division Four.

March 8, 1988.

Donald E. Heck, Clayton, for defendant-appellant.

David Eric Sowers, Elaine Bensavage, St. Louis, for plaintiffs-respondents.

GRIMM, Judge.

In this non-jury case, defendant Structural Systems, Inc., appeals from a judgment in favor of plaintiffs Donald L. Darr (Darr) and Wanda J. Darr for $64,000. Structural, in effect, claims that the trial court erred in finding that (1) Darr was an assignee of a warranty given by Structural to Ford Motor Company; (2) asphalt repairs made by Structural to a parking lot were insufficient to satisfy the warranty; (3) the oral demand for warranty action was sufficient when the warranty required written notice; and (4) Darrs stated a claim, because they "proceeded to trial under an improper theory of law." Finding no reversible error, we affirm.

On February 5, 1979, Structural submitted a proposal "for the complete design, engineering, and construction of a dealership facility known as Suburban Ford located at Arnold, Missouri, for the Ford Leasing Development Company." The construction was to be "in strict accordance with owner's "General Conditions", drawings, specifications, and "Design–Build Criteria". As a part of the proposal, Structur-

al submitted a site plan, showing drainage, utilities, and grades dated January 29, 1979, which it had prepared. On April 4, 1979, Ford Leasing Development Company issued its purchase order to Structural for the project. The project was substantially completed in 1979, and Suburban Ford Sales, Inc., opened for business in January, 1980. However, Suburban was not financially successful, and in the summer of 1980, all of the capital stock in Suburban was sold to Donald L. Darr; in October, 1980, the Darrs purchased the real estate on which the dealership was located. Darr subsequently changed the name from Suburban to Don Darr Ford, Inc.

As is not uncommon with a project this size, there were construction items that needed to be either completed or corrected after occupancy occurred. In October, 1980, Darr met with Fred Caress, a vice-president of Structural, to discuss items that needed to be completed. Thereafter, Darr wrote a letter to Caress dated October 22, 1980, thanking him for the meeting and listing 11 items "that you agreed need to be either corrected or completed"; a copy of that letter went to Lee Vincent, a Ford architect who was involved with this project. The letter was signed Don Darr Ford, Inc., Don Darr. Among the 11 items were two references to the parking lot, i.e., "Blacktop on lot (breaking up and uneven)" and "Blacktop on lot—See Anco Testing Laboratory Test Data (enclosed)".

The "problem" with the parking lot was not resolved, and on July 9, 1981, Vincent wrote Caress a letter confirming telephone conversations they had on July 7 and 8, 1981; a list of deficiencies was attached to the letter. As relates to the parking lot, the attachment showed "Asphalt Paving: Ponding Water, Water runs in under the doors, Uneven Surfaces, Breaking up in some areas". Following that, Structural had an asphalt company go out and "bring up" some areas, cut two swales, and fix some potholes. This was done to alleviate the problems that the water was ponding and the grading was not proper.

Thereafter, on August 12, 1981, M.L. Bohanon, an architecture and engineering manager for Ford, wrote Darr as a follow-up to an inspection and meeting held August 5. He advised Darr (1) that Structural had satisfactorily completed the punch list, including "Asphalt paving: Patching and repairs"; (2) "Any additional deficiencies are covered under the warranties issued by the general contractor"; (3) that the general warranty from Structural was enclosed, as well as the asphalt paving warranty; and (4) "Fred Caress of Structural Systems, Inc., has committed to me that all additional warranty repairs will be attended to promptly." The general warranty from Structural to which Bohanon referred was dated June 5, 1981. It basically contained the language required by the bidding documents furnished by Ford to Structural. The guarantee, for a 2 year period beginning January 10, 1980, was "that all labor and materials furnished and work performed by [Structural] are in accordance with the contract, plans and specifications and authorized alterations and additions thereto; that, should any defect develop during the contract guarantee period, as hereinafter defined, due to improper materials, workmanship or arrangement, the same shall, upon written notice, be made good by the Contractor without expense to the Owner." At trial Bohanon testified that the purpose of sending the guarantee to Darr "was to basically transfer the basic responsibility for advising the contractor of any deficiencies" to Darr. However, Structural's attorney asked Bohanon "You testified in cross-examination that you assigned warranties to Mr. Darr by your letter of August the 12th?", to which he replied "That was my intent, yes." Structural's attorney then asked, "Do you hold yourself out as having authority on behalf of Ford Motor Company to execute assignments of guarantee or warranties?"; Bohanon said, "It was my belief that sending these documents to Mr. Darr was in fact a transfer or assignment or whatever you want to call it."

■ Structural's first point is that the trial court erred in finding that Darr was an assignee of the warranty Structural gave to Ford Leasing Development Company, a Delaware corporation. The difficulty

with Structural's point is that Structural did not give its warranty to Ford Leasing Development Company. Rather, the June 5, 1981, document was addressed to "Ford Motor Company, Dealership Real Estate Office". The trial court so found and the evidence supports that finding.

Further, the letter of August 12, 1981, from M.L. Bohanon was on Ford Motor Company Dealership Real Estate Office stationery. Bohanon testified that it was his intent to assign the warranties by his letter of August 12, 1981. "[A]ny language, however informal or poorly expressed, if it shows the intention of the owner of the property or chose in action to transfer it, clearly and unconditionally, and sufficiently identifies the subject matter will be sufficient to vest the property therein in the assignee." *Greater Kansas City Baptist and Community Hospital Assn., Inc. v. Businessmen's Assurance Company*, 585 S.W.2d 118, 119 (Mo.App.W.D. 1979). Here, the warranty was mailed from the Ford Motor Company Dealership Real Estate Office to Darr by M.L. Bohanon. Bohanon testified that he had been with Ford since 1968, and in his position as architecture and engineering manager of the western region of the Dealership Real Estate Office since September 1, 1980.

■ Structural, in contending that Darr failed to establish that he was the assignee of the warranty given by Structural to Ford, further argues that there was no evidence that Bohanon was an agent for Ford or that Bohanon had authority to assign the warranty. However, where it appears that an agent has done an act for the benefit of his principal and the principal has not questioned the authority of the agent to bind him, it will be presumed, until the contrary appears, that the agent was duly authorized. 3 Am.Jur.2d, Agency § 361. There is no evidence that Ford disputes Bohanon's authority or that Ford claims the warranty belongs to Ford instead of Darr. There was sufficient evidence to support the trial court's finding and conclusion that the warranty was assigned to "Darr on August 12, 1981, by

Ford Motor Company, Dealership Real Estate Office." Point denied.

■ Structural's second point was that the trial court erred in "finding that the repairs to the parking lot were insufficient to satisfy Ford's written demand when Ford admitted that the repairs were satisfactory." Structural bases its contention that the repairs made in July or August, 1981, "were satisfactory" on the testimony of M.L. Bohanon. Bohanon was asked if the items on the July 9 punch list had been completed "to the satisfaction of Ford Dealership Facility Company" and he said yes. If that was all that Bohanon said on this subject, Structural's point might have merit. However, Bohanon also had this to say about the parking lot and the warranty:

&ast; &ast; &ast; &ast; &ast; &ast;

A. "The punch list is basically a list of final completion items or final repairs or corrective actions required under the contract in order to basically complete the phase one of the construction of the facility *which is separate and apart from any guarantee or warranty work* that might arise subsequent to the completion and occupation of the facility. (emphasis added)

&ast; &ast; &ast; &ast; &ast; &ast;

Q. When you had your telephone conversation with Mr. Caress prior to your August 12 letter, what, if any, comments did you make to Mr. Caress concerning the fact that you were assigning warranties to Don Darr?

A. I think I just made it clear to him that he was expected to respond to any request for repairs that originated with Mr. Darr under the terms of the guarantees and warranties.

In other testimony, Bohanon said that (1) you can look at an asphalt repair and see that repairs have been made, but you cannot determine by visual inspection if the repairs will stand up; (2) he had no "opinion as to whether or not the repairs were adequate and up to the standards that Ford required"; and (3) since he didn't see the repairs, he had no opinion whether the re-

pairs were done in a good workmanlike manner. Thus, Bohanon distinguished between work done on a punch list to complete the project initially and work to be done subsequently under the guaranty. There was no evidence that the repair work done in July or August satisfied the guaranty requirements; rather, as Bohanon said, that work was done "in order to basically complete the phase one of the construction of the facility which is separate and apart from any guarantee or warranty work." Point denied.

Structural's third point is that the trial court erred in finding that Darr's "oral demand for warranty action" was sufficient to create an obligation for Structural to perform under its warranty. We are unable to find that the trial court made any such specific finding. The court did prepare six pages of findings of fact and conclusions of law and judgment. Included was the finding of fact that "Structural was advised by Darr that the parking lot repairs were ineffective; Structural responded that it would undertake no further repairs." In its conclusions of law, the court said that Structural, "despite demand, failed to correct defects covered by said warranty, in violation of its contractual obligations."

As indicated previously, Ford assigned the warranty to Darr when Bohanon sent the warranty to Darr on August 12, 1981. Relatively near to that date, Bohanon had telephone conversations with Caress about construction deficiencies. Bohanon told Caress that Darr "was responsible for advising Caress of these various problems, and that it was his responsibility under our contract and under the guarantees to provide the appropriate assistance." Bohanon's testimony then continued by saying "He [Caress] then verbally assured me that given that he was contacted personally anytime a problem came up, that he would personally see to it that the appropriate repairs were made." Bohanon's oral testimony is supported by his August 12 letter, wherein he said Caress "has committed to me that all additional warranty repairs will be attended to promptly. ... please under-

stand that *all* warranty claims are to be directed to Mr. Caress, who will then personally arrange for all repairs" (emphasis in original).

Structural had asphalt repairs made in the summer of 1981, before Bohanon's letter of August 12. Following the first rain after the repairs had been made, which Darr estimated was about two weeks, Darr contacted Caress. He told Caress that the "repairs were not working and I would like for him to come back and do some more." Darr said that Caress' reply was that "He was not going to do anything else." Caress denied that this conversation took place. Rule 73.01(c)(2) requires an appellate court to give due regard to the opportunity of the trial court to have judged the credibility of witnesses. Deference is accorded the trial court even if there is evidence which might support a different conclusion. *MacCurrach v. Anderson*, 678 S.W.2d 459 (Mo.App.E.D. 1984), citing *Ware v. Ware*, 647 S.W.2d 582, 584 (Mo.App.E.D.1983). Further, *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), directs appellate courts to sustain the judgment of the trial court unless there is no substantial evidence to support the judgment or the judgment is against the weight of the evidence, or the judgment erroneously declares or applies the law. Under this narrow standard of review, we sustain the trial court's finding that Structural was advised that the parking lot repairs were ineffective and that Structural would make no further repairs. Although Darr gave verbal notice rather than written notice, the law does not require a party to do a useless act. Cf. *Randolph v. Supreme Liberty Life Ins. Co.*, 215 S.W.2d 82 (Mo.App.E.D.1948); and *Custom Craft Tile, Inc. v. Bridgecrest, Inc.*, 687 S.W.2d 248, 250 (Mo.App.E.D.1985). Thus, Structural's third point is denied.

Structural's fourth point is:

THE TRIAL COURT ERRED IN NOT FINDING THAT PLAINTIFFS–RESPONDENTS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED FOR REASON THAT DARR PROCEEDED TO TRIAL UN-

DER AN IMPROPER THEORY OF LAW.

Rule 84.04(d) requires that a point "shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous." This point does not appear to comply with the rule. However, from the wording of the point, it would appear that Structural is appealing from the trial court's failure to sustain its motion for judgment at the close of Darrs' case. After the trial court failed to sustain its motion, Structural presented evidence; it thereby waived its right to complain of the trial court's action. *Marlo Coil Corporation v. Grand Park Corporation*, 348 S.W.2d 610, 612 (Mo.App.E.D.1961).

However, in the argument portion of the brief under this point, Structural claims the court erred (1) by finding that the floor and parking lot elevations as constructed were not in accordance with the agreement between Structural and Ford, and (2) by concluding that Structural failed to correct the defects covered by the warranty. What we said earlier under Structural's third point disposes of the latter claim. As to the former, suffice it to say that there was sufficient, although conflicting, evidence to support the trial court's finding, based on the Fox and Cole surveys, that the as-built elevations did not coincide with the original design elevation. Point denied.

The judgment is affirmed.

SIMON, P.J., and CRANDALL, J., concur.