The WASHINGTON UNIVERSITY, Plaintiff-Respondent,

v.

ROYAL CROWN BOTTLING COMPANY OF ST. LOUIS, Royal Crown Companies, Inc., Universal Foods Corporation, and American Winery, Inc., Defendants-Appellants.

No. 57188.

Missouri Court of Appeals, Eastern District, Division Three.

Dec. 4, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 9, 1991.

Application to Transfer Denied Feb. 7, 1991.

Mark E. Goodman, Rosenblum, Golden-hersh, Silverstein & Zafft, P.C., Clayton, Steven M. Cockriel, Edward M. Golden-hersh, Greensfelder, Hemker & Gale, P.C., Joseph E. Martineau, Lewis, Rice & Fing-ersh, St. Louis, for defendants-appellants.

Gerard Timothy Carmody, Bryan, Cave, McPheeters & McRoberts, St. Louis, for plaintiff-respondent.

CRANE, Judge.

Defendants Royal Crown Bottling Company of St. Louis [Royal Crown Bottling], Royal Crown Companies, Inc. [Royal Crown], Universal Foods Corporation [Universal] and American Winery, Inc. [American Winery], [collectively referred to as the defendants] appeal from a judgment granting declaratory judgment and a decree of specific performance in favor of plaintiff The Washington University [the University]. The court decreed that the twenty-five year net lease between the University and Royal Crown Bottling required Royal Crown Bottling to make all repairs to the buildings owned by the University and leased to Royal Crown Bottling. The trial court held that "all repairs" included structural repairs. The court ordered Royal Crown Bottling and Royal Crown to make specific repairs, reimburse the University for emergency repairs made during litigation, and make all repairs that would become necessary in the future. The court further ordered all defendants to pay $125,-934.78 in attorney's fees and expenses. We affirm the portion of the judgment which grants declaratory relief and specific performance and reverse the portion of the judgment which awards attorney's fees and expenses.

On July 31, 1976, Royal Crown Bottling entered into a 25 year lease with the University for four parcels of real estate in the City of St. Louis. These properties had been the subject of a preexisting lease between the parties and were used for soft drink bottling and distribution operations. The new lease provided that a one-story building would be improved and modernized, another one-story building would be demolished and a new building would be constructed. The cost of these improvements was amortized into Royal Crown's rental payments over the life of the lease. The lease specifically provides that it is a "net" lease. The repair clauses provide that lessee will repair all damage and keep the premises in repair. On July 30, 1979, Royal Crown executed a Guarantee of Lease whereby it agreed to honor all of lessee's obligations under the lease, "... including, but not limited to, ... repair,...."

On August 13, 1979, the parties signed a First Amendment to Lease which added three parcels of property to the original lease. [The original lease together with the amendment will hereinafter be referred to as the "master lease"]. The three additional parcels of property were acquired by the University at the request of Royal Crown Bottling. The costs of land acquisition, construction of a parking lot, and specific repairs and improvements to the existing premises were likewise amortized into Royal Crown's rental payments over the life of the lease. While Royal Crown Bottling occupied the premises, all needed maintenance and repair work was performed by Royal Crown Bottling at its cost.

On May 8, 1981, Royal Crown Bottling subleased the buildings to Universal. Upon subleasing the premises, Universal contracted and paid approximately $98,000 for roof and deck work and $300,000–$400,000 in repair and remodeling work to the buildings, including replacing portions of the concrete floors. The University was not asked to pay for these repairs.

On April 24, 1985, Universal assigned its sublease to American Winery. The University approved the sublease and assignment with the condition that Royal Crown Bottling was not released from its obligations under the master lease. When American took over the leased property, it continued to make repairs to sewers, walls and doors but did not make roof repairs. In early 1987 the University conducted an informal

inspection of the property and found significant problems with the roofs on the buildings. The University requested American to make all necessary repairs. American acknowledged that the repairs were the responsibility of the lessee and advised that the work had been done. The University later discovered that American had not made the repairs.

In the spring of 1987, the University hired Prestige Roofing Design and Consulting, Inc. and the Kuhlmann Design Group to make detailed inspections of the buildings. The two companies reported that extensive repairs, including roofing, tuck-pointing, caulking, painting, and masonry, were needed. The University sent copies of the reports to the defendants along with a letter stating that if the repairs were not undertaken in 30 days the University would do the work and seek reimbursement from them. The defendants denied responsibility for these repairs. This was the first time that a dispute over repairs arose under the lease. Prior to this dispute the University was never asked to pay for any repairs.

Thereafter, the University filed a petition for declaratory judgment and specific performance. The defendants answered that the University was responsible for the repairs and replacements. American and Universal filed counterclaims against the University. The defendants filed cross-claims for declaratory judgments against each other, which were severed for separate trial subject to the stipulation that any order granting relief to the University on its claims would constitute a final adjudication on the merits for the purpose of appeal.

Shortly prior to trial the defendants filed a joint stipulation in which they agreed that certain repair work was needed and that they were responsible for what they characterized as "ordinary repairs" and "routine maintenance". However, they denied responsibility for any work which they classified as "structural".

The trial court heard testimony from employees and experts on both sides regarding the necessity and extent of the repairs and made its own inspection of the premises. After trial the trial court entered its Findings of Fact, Conclusions of Law, and Order. The court concluded that the master lease required Royal Crown Bottling to make all repairs, including those that are structural. The court determined that approximately 20% of the then needed repairs were structural and were necessitated by Royal Crown Bottling's failure to maintain the buildings. The court ordered that all currently needed repairs be made as well as any repair work that became necessary in the future and ordered Royal Crown Bottling to reimburse the University for certain emergency repairs made by the University during the litigation. The court further held that the defendants were jointly and severally liable for $99,112.37 in attorneys' fees and $26,822.41 in expenses.

Defendants raise nine points on appeal. We will address them in the order in which they were raised.

## MOTION TO DISMISS

■ Defendants first argue that the trial court erred in overruling their Motion to Dismiss. Defendants' motion, filed on the second day of trial, requested the court to dismiss the First Amended Petition "because it fails to state a claim upon which relief can be granted for the reason that Plaintiff admits in its Petition that it has an adequate remedy of law." At the hearing in the trial court defendants contended that this admission consisted of the allegations that Royal Crown had an obligation under the lease to make and pay for all repairs and that Royal Crown "breached this lease by failing to maintain and repair the leased premises in accordance with the lease terms." They further argued that these allegations, combined with a statement in a proposed trial exhibit, constituted an admission that "Plaintiff acknowledges it has a remedy at law."

■ In determining whether any petition, including one purporting to state a cause of action for a declaratory judgment, states a claim, its language is "to be given a liberal construction, according the averments their reasonable and fair intend-

ment.... So considered a petition should be held sufficient if its averments invoke substantial principles of law which entitle plaintiff to relief." *City of Creve Coeur v. Creve Coeur Fire Pro. Dist.*, 355 S.W.2d 857, 859 (Mo.1962) [citation omitted]. In considering whether a petition states a claim for declaratory relief, the question for the trial court is not whether the petition shows that the plaintiff is entitled to the declaratory relief he seeks in accordance with the theory he states, but rather it is whether under the averments of the petition he is entitled to a declaration of rights at all. *Id.* If the averments are sufficient to show the propriety of declaratory relief, it is improper to dismiss the petition. *Brewer v. Brewer*, 575 S.W.2d 216, 217 (Mo.App.1978). A petition for a declaratory judgment may seek additional relief, including coercive relief. *Ward Parkway Shops v. C.S.W. Consultants*, 542 S.W.2d 308, 311 (Mo.App.1976).

■ The trial court did not err in denying Defendants' Motion to Dismiss. There was no direct admission in the Petition that plaintiff had an adequate remedy at law and, if we accord the averments their reasonable and fair intendment, no statements from which such an admission could be implied. Contrary to defendants' argument, plaintiff did not allege that Royal Crown had "breached" the lease. The statements in the proposed trial exhibit could not be considered on a motion to dismiss for failure to state a claim.[1]

■ *Love Mortgage Properties, Inc. v. Horen*, 639 S.W.2d 839 (Mo.App.1982), on which defendants rely, is clearly distinguishable. In Count I of *Love* plaintiff specifically alleged that defendant had "breached this Lease Contract" by various acts and requested the court to declare the lease "breached". In affirming the trial court's dismissal of the Count I, we held, "(a)lthough plaintiff ostensibly seeks declaratory relief, its real cause of action is an action at law for breach of contract."

*Id.* at 841. The First Amended Petition in this case seeks no such relief. Instead the relief sought is the resolution of the controversy over the interpretation of the repair clause of an ongoing lease. Interpretation of leases, including the interpretation of repair covenants, may be resolved by a declaratory judgment action. *See, e.g., Union Center Redevelopment Corp. v. Leslie*, 733 S.W.2d 6 (Mo.App.1987); *Ward Parkway, supra*, 542 S.W.2d at 311; *Thomas W. Garland, Inc. v. Rubin*, 493 S.W.2d 74 (Mo.App.1973).

No remedy at law would completely resolve this dispute. This action involves the interpretation of a lease that does not terminate until 2001. An award of damages would not fully and finally settle the dispute between the parties regarding the lessee's repair and maintenance obligations, and would not eliminate potential future litigation as the need for other repairs arose. The purpose of the Declaratory Judgments Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations...." § 527.120, RSMo 1986. A judicial declaration of the lessee's repair and maintenance obligations would provide certain and secure relief. This is one of those instances "where it is desirable that the relationship of all the parties be established because there may be a continuing relationship or future acts which depend on the outcome." *Polk County Bank v. Spitz*, 690 S.W.2d 192, 194 (Mo.App.1985).

Defendants state they do not dispute the propriety of a declaratory judgment action to interpret or construe a lease, but argue that a declaratory judgment action may not be used to obtain an order that a lessee perform its obligations under a lease, again relying on *Love Mortgage, supra. Love Mortgage* does not support this contention. In the second part of the *Love Mortgage* opinion, we upheld the trial court's denial of a temporary injunction which required

---

1. There is no indication that the trial court treated this motion for dismissal as one for summary judgment under Rules 55.27(a) and 74.04, and therefore only those matters appearing on the face of the petition may be considered. *Shapiro v. Columbia Union Nat. Bank & Trust Co.*, 576 S.W.2d 310, 315 n. 6 (Mo. banc 1978), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). *See also, Schmidt v. Schmidt*, 617 S.W.2d 601, 604 (Mo.App.1981).

the lessee to keep the premises in good repair, on the grounds that the issue was *moot* because the lessee had vacated the premises. 639 S.W.2d at 841. *Love Mortgage* does not hold that such relief could not be properly awarded in a declaratory judgment action. On the contrary coercive relief may be so requested. *Ward Parkway, supra,* 542 S.W.2d at 311. Point I is denied.

## MOTION FOR JUDGMENT AT CLOSE OF PLAINTIFF'S EVIDENCE

■ For their second point defendants assert that the trial court erred in denying their motion for judgment at the close of plaintiff's evidence because the University failed to establish an essential element of its cause of action in that the University did not present evidence of the condition of the premises at the commencement of the lease and did not prove that the premises were in worse condition than when the lessee took possession of them.

We first note that this motion was misdirected. The motion was specifically addressed to the failure of the University to make a *prima facie* case for *breach* of the covenant to repair. The cases cited in support of the proposition that the condition of the leased premises at the commencement of the lease term must be established are breach of lease cases in which damages are being established. The usual measure of damages in such cases is diminution in value over the life of the lease in which the condition of the premises at the commencement is obviously relevant. However, this was not an action for breach of a covenant to repair but a declaratory judgment action. Declaratory relief and specific performance were being sought, not money damages. The motion was not addressed to the sufficiency of the petition actually filed.

■ Even if there were grounds to consider whether this contention applies to a declaratory judgment action, we may not do so. After the trial court failed to sustain their motion for judgment at the close of plaintiff's evidence, defendants put on evidence. Defendants thereby waived their right to complain of the trial court's action. *Darr v. Structural Systems, Inc.,* 747 S.W.2d 690, 695 (Mo.App.1988). Point II is denied.

## STRUCTURAL REPAIRS

■ For their third point defendants assert that the trial court erred in requiring Royal Crown Bottling to make any structural repairs which may be needed in the future because the master lease does not specifically require the lessee to make structural repairs.

The relevant portions of the trial court's Order, which defendants challenge under this point, read as follows:

2) The terms of the Master Lease require Royal Crown Bottling, at its expense, to make each and every repair now needed or needed hereafter during the lease term;

3) Royal Crown Bottling shall undertake forthwith to make the repairs set forth in the Addendum and to make such other repairs during the remainder of the lease term as are necessary to keep the property in good repair.

In its Conclusions of Law, the trial court found that the parties intended that the lessee be responsible for "all costs" associated with the property, and therefore the lessee is responsible for all repairs to the leased premises including those which are structural in nature.

Defendants do not challenge their responsibility under the lease to make structural repairs occasioned by their failure to properly maintain the leased premises. *See Abuzeide v. Body of Christ Fellowship Inc.,* 739 S.W.2d 759, 760 (Mo.App.1987). Instead, defendants argue that they are not responsible for structural repairs which are not occasioned by their failure to maintain.

■ In interpreting leases our primary concern is to give effect to the true intention of the parties by considering the language used in the lease. If the lease is unambiguous, we may only consider the text of the lease agreement as evidence of the parties' intent. *J.E. Hathman, Inc. v.*

*Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. banc 1973); *In re Estate of Lewis*, 492 S.W.2d 385, 387 (Mo.App.1973). *See also*, 49 Am.Jur.2d Landlord and Tenant § 141 (1970). The meaning of a repair covenant derives from all the relevant circumstances reflected in the language of the lease. 1 M. Friedman, Friedman on Leases § 10.601 at 659–60 (3rd ed. 1990).

Section 9 of the master lease allocates responsibility for repairs and maintenance. This section includes the repair clauses, which provide:

> Lessee agrees that it will, at its own proper cost and expense, repair all damages or injuries done or suffered by it or any one under it to the interior and exterior of the leased premises, including all appurtenances, glass, fixtures, fire escapes and equipment during the full period covered by this lease ...; and that Lessee will, at its cost and expense and without deduction from the rental payments, make all repairs necessary to keep the leased premises in good repair....

These clauses place responsibility for "all repairs" on the lessee, without specifying whether "all repairs" includes structural repairs. Such silence does not necessarily make the lease ambiguous. *Mobil Oil Credit Corp. v. DST Realty Inc.*, 689 S.W.2d 658, 660 (Mo.App.1985). Words used in a written lease, which are not defined in the lease, are to be interpreted according to their usual and ordinary meaning. *Hargis v. Sample*, 306 S.W.2d 564, 568 (Mo.1957); *Hamilton Music v. Gordon A. Gundaker Real Est.*, 666 S.W.2d 840, 843 (Mo.App.1984). "Repair" has been defined as "[t]o mend, remedy, restore, renovate. To restore to a sound or good state after injury, dilapidation, or partial destruction." Black's Law Dictionary 1167 (rev. 5th ed. 1979), quoted in *Windsor Real Estate & Mortgage Company v. Ruma*, 674 S.W.2d 252, 254 (Mo.App.1984). Thus, the usual and ordinary meaning of repair does not exclude a repair that is structural in nature.

No Missouri case has determined whether this type of repair clause includes structural repairs in the context of a long-term net lease, which this lease is. *Garland, supra*, 493 S.W.2d 74 involved a 30 year net lease, but we did not reach the question of whether the repair clause covered structural repairs because the repair at issue was not structural. Several cases have interpreted or construed such clauses in the circumstances presented by short-term leases. In *Ridley v. Newsome*, 754 S.W.2d 912 (Mo.App.1988), involving a three year lease, the court found that silence in the repair clause on the question of whether structural repairs are contemplated created an ambiguity and therefore looked to extrinsic circumstances to construe the lease. In *Mobil, supra*, 689 S.W.2d at 660, the court found that silence in a ten year lease on the question of structural repairs did not make the repair clause ambiguous and held that a lessee's obligation to repair does not extend to structural repairs unless the lessee clearly covenants to undertake structural repairs.

The differing approaches of *Ridley* and *Mobil* indicate that there is no general rule which applies to the circumstances found in short-term leases. Both cases reached the same result, finding that the tenant did not have an obligation to make structural repairs. Both cases fall within the general observation that where the lease is for a short-term and the costs of repair are more than the aggregate rent over the term, courts are reluctant to construe "repair" to include major structural repairs. 1 M. Friedman, Friedman on Leases § 10.601 at 655–56 (3rd ed. 1990). Furthermore, neither case establishes a broad rule which can be extended to the very different circumstances presented by long-term net leases.

This lease presents circumstances which differ from those found in short-term leases. It is a 25 year lease which contemplates commercial use of the property with the lessee in control of the entire premises. It requires the lessee to pay a lump sum rental (based in part upon cost of acquisition and improvement) that did not increase during the term and to obtain and pay for casualty and liability insurance. It gives

the lessee a first right of refusal to purchase the premises in the event the University would decide to sell the property. "Where the term is longer and the tenant has time to amortize the cost, a repair clause is more apt to be construed literally." 1 M. Friedman, Friedman on Leases § 10.601 at 656 (3rd ed. 1990).

Of overriding importance in determining the intent of the parties is the provision in Section 7 of the lease which reads as follows: "Anything herein to the contrary notwithstanding, it is expressly understood and agreed that this is a net lease and Lessee shall assume all expenditures for repairs to and maintenance of the demised premises during the term of this lease." The inclusion of this language makes it unquestionably clear that the parties intended to create a "net" lease and for Royal Crown Bottling to be strictly bound by the repair clauses. See 1 M. Friedman, Friedman on Leases § 10.8 at 672–73 (3rd ed. 1990):

"A net lease presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance or any other charges, other than landlord's income taxes. Accordingly, the repair clause requires tenant to make all repairs, inside and out, structural and otherwise, as well as all necessary replacements of the improvements on the premises (and to comply with all legal requirements affecting these improvements during the term). A lease is not 'net', as this term is used in long-term leases, if the tenant's repair obligations are less than these."

Having examined the repair clause in the context of the entire lease and the circumstances reflected in the lease, we find that the covenant to repair is unambiguous, and that the language of the lease considered as a whole reveals that the parties intended the lessee to assume all costs of repairs and maintenance of the premises, including the cost of structural repairs.

Even if we were to hold the covenant to repair to be ambiguous, and were to construe the lease as understood and acted upon by the parties, *Tri–Lakes Newspapers, Inc. v. Logan,* 713 S.W.2d 891, 894 (Mo.App.1986), we would reach the same result. Royal Crown Bottling's offers to lease the three additional parcels specifically provided that the lease of those parcels would be a "net" lease:

*Net, net, net lease.* The lease shall be a 'net, net, net lease' under which Royal Crown Bottling Corporation as Lessee shall assume all responsibility and liability for repairs and maintenance of the premises (both interior and exterior), insurance premiums, taxes, if any, etc. It is the intent of both parties that Royal Crown Bottling Corporation be responsible for all costs during the life of the lease.

Costs of initial renovation and land acquisition were amortized over the life of the lease and added to the rent. All repairs were performed by Royal Crown Bottling while it occupied the premises. When Universal took over, it performed major structural repairs. After American took over it continued to make some repairs and advised the University that all repairs had been done. It was not until the University discovered the roof repairs had not been done and demanded that they be performed, that the lessees for the first time in eleven years contended that they were not responsible for repairs. They later modified this position to deny responsibility only for structural repairs. The conduct of the parties prior to this dispute establishes that the lessee is responsible for structural repairs. *Johnston v. First Nat. Bank & Trust Co., Etc.,* 624 S.W.2d 500, 502 (Mo. App.1981).

*Mobil, supra,* 689 S.W.2d 658, cited by defendants, does not apply. *Mobil* was not a long-term lease. The lease provided for certain repairs to be made by the landlord. There was no history of the tenant undertaking structural repairs. The structural repair at issue was to correct an unforseeable latent structural defect which existed prior to the lease.[2]

2. This kind of problem is addressed by the casu-

alty clause in the Royal Crown lease.

Neither *Abuzeide, supra,* 739 S.W.2d 759, nor *Thomas W. Garland, Inc., supra,* 493 S.W.2d 74, are inconsistent with the result we have reached. *Abuzeide* involved a three year lease in which the tenant argued that it was not bound to keep the furnace in repair, citing *Mobil.* We distinguished *Mobil* on the grounds that the repair in issue was not structural and was occasioned by the tenant's negligence. In *Garland,* as we have already pointed out, we did not reach the question of whether the repair clause covered structural repairs because the repair at issue was not structural. Point III is denied.

### REPLACEMENT OF ROOFS

Under their fourth point, defendants argue that the trial court's conclusion that the roofs on four of the buildings must be removed and replaced was against the weight of the evidence. The defendants restate their experts' opinions that the roofs do not need this extensive work and point out that some of the University's witnesses testified contrary to the University's position. The University presented testimony showing this replacement is needed.

"Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). "[C]onflicts in the evidence were for the trial court to resolve, and the facts must be taken in accordance with the result reached by the trial court." *Trenton v. Western Surety Co.,* 599 S.W.2d 481, 483 (Mo. banc 1980). A number of qualified experts testified to the necessity of the repairs. The trial judge made his own inspection of the premises. The trial court's decision was clearly not against the weight of the evidence. Point IV is denied.

### ATTORNEY'S FEES

For their next three points, defendants contest the trial court's award of attorney's fees and expenses to the University. We reverse that portion of the judgment which awarded attorney's fees and expenses.

Judgment was entered against defendants, jointly and severally, for attorney's fees and expenses in the amount of $125,934.78. The court entered the following Conclusions of Law and Findings of Fact, which are relevant to this portion of the judgment:

Conclusions of Law:

15. The Missouri Declaratory Judgments Act permits the trial court to "make such award of costs as may seem equitable and just." Section 527.100, RSMo.1986. These costs include attorneys' fees. *Union Center Redev. Corp. v. Leslie,* 733 S.W.2d 6 (Mo.App.1987).

16. The Court finds that, independent of this authority, an award of attorneys' fees in this action is appropriate based upon general equitable principles.

17. The Court has analyzed The University's fees using the factors delineated in *Ozark Prod. Credit Association v. Walden,* 695 S.W.2d 919 (Mo.App.1985), and finds them to be reasonable. The Court also finds that substantial attorneys' fees and expenses have been incurred because of the inconsistent positions taken by the defendants from the inception of this controversy. In the face of the clear lease language and their continuing course of conduct, all defendants initially denied any liability for maintenance and repairs. In fact, Universal made a demand upon The University to perform some of the repairs which Universal later claimed were unnecessary. This Court, in the exercise of its discretion, feels that the University's attorneys' fees are reasonable and justified under the circumstances.

18. As further support for its award of fees and expenses, the Court also finds that Universal's conduct as cited in paragraph 19 of the Findings of Fact resulted in a substantial accumulation of legal fees by plaintiff's attorneys.

Findings of Fact:

19. The Court further finds that Universal failed to disclose information re-

garding its inspections of the premises and the work it had performed, failed to disclose the existence of the Riggin Memoranda (which agreed with Plaintiff's Kuhlmann report), and failed to comply with a court order issued by Presiding Judge Ryan directing it to produce those memoranda in conjunction with Riggins' deposition.

20. Based upon the evidence adduced, the Court finds that The University's attorneys' fees of $99,112.37 and expenses of $26,822.41, totaling $125,934.78 are reasonable.

■ The University asked for costs in the prayer of its first amended petition, but did not specifically ask for attorney's fees. Missouri follows the "American Rule" which is that with few exceptions, absent statutory authorization or contractual agreement, each litigant must bear the expense of his own attorney's fees. *Mayor, Councilmen, & Citizens, Etc. v. Beard,* 636 S.W.2d 330, 331 (Mo. banc 1982); *County Court of Washington County v. Murphy,* 658 S.W.2d 14, 16 (Mo. banc 1983); *Temple Stephens Company v. Westenhaver,* 776 S.W.2d 438, 442 (Mo.App. 1989).

Since there was no provision for attorney's fees in the lease, we must determine if they are authorized by statute. The trial court found that the Missouri Declaratory Judgments Act permits the court to "make such award of costs as may seem equitable and just." § 527.100 RSMo 1986. It further found that these costs included attorney's fees, citing *Union Center, supra.*

The Missouri Supreme Court in *Mayor, supra,* held that the Declaratory Judgments Act is not in and of itself support for awarding attorney's fees. In *Mayor* the court affirmed a trial court's denial of attorney's fees in a declaratory action authorizing a land annexation. The court, following the American Rule, stated, "(a)lthough appellants refer to 527.100 RSMo.1978, which provides that the court may make an award of costs in a declaratory judgment action, they show no statutory authorization or contractual agreement for

an award of attorney's fees to satisfy the governing rule." *Id.* at 331.

■ There is an exception to the American Rule in declaratory judgment actions, known as the *"Bernheimer* exception", found in the decision of *Bernheimer v. First National Bank of Kansas City,* 359 Mo. 1119, 225 S.W.2d 745 (1949). *Mayor, supra,* 636 S.W.2d at 331. In *Bernheimer* the court reversed the trial court's denial of attorney's fees and awarded attorney's fees out of a trust fund. 225 S.W.2d at 755. This award has been explained as follows:

> Although it was a declaratory judgment action, it was filed in *equity* to obtain construction of a testamentary trust insofar as determining whether the minor plaintiff was the lawful issue of the body of his father. The trustees, residuary legatees and potential unborn future issue of the father were parties. In such *special circumstances* the court awarded attorney's fees to all parties for the reason that there was an ambiguity in the phrase "lawful issue" and its resolution and attendent questions were "important to the testamentary trustees in ascertaining the meaning of the will, and in charting a course for the administration of the trust estate."

*Mayor, supra,* 636 S.W.2d at 331, (quoting *Bernheimer,* 225 S.W.2d at 755) [Emphasis added].

The Supreme Court in *Mayor* was careful to limit the *"Bernheimer* exception" to one of "special circumstances" and held that "costs" in § 527.100 did not automatically include attorney's fees. The court specifically rejected the broad interpretation given to *Bernheimer* by later cases that "costs" in declaratory judgment actions include attorney's fees and distinguished *Labor's Educational and Political Club—Independent v. Danforth,* 561 S.W.2d 339, 350 (Mo. banc 1977), relied upon by the University. The Supreme Court reaffirmed *Mayor* and again distinguished *Danforth* on the question of attorney's fees in *County Court, supra,* 658 S.W.2d at 16–17.

Correctly interpreted, the *Bernheimer* "special circumstances" exception to the American Rule is narrow and must be strictly applied. In *Harold S. Schwartz v. Continental Cas.,* 705 S.W.2d 494 (Mo. App.1985), we overturned the award of attorney's fees to an insured in a declaratory action against its insurer to determine coverage under its insurance policy. Although we affirmed the trial court's judgment that the insurer was obligated to pay defense and settlement costs under the policy, we held "plaintiffs have shown no special circumstances which would bring this case within the *Bernheimer* exception." *Id.* at 499. *See also Frey v. Huffstutler,* 748 S.W.2d 59, 65–66 (Mo.App.1988).

The trial court incorrectly relied on *Union Center, supra,* for a broad rule that "costs" within § 527.100 include attorney's fees. The trial court's award of damages in that case was not challenged on the grounds of whether the award was a violation of the American Rule as expressed in *Mayor, supra,* and its progeny or whether special circumstances existed to constitute an exception to the American Rule. *Temple Stephens, supra,* 776 S.W.2d at 442. Furthermore *Union Center* relied on cases which were handed down prior to the Missouri Supreme Court's decision in *Mayor,* which definitively restated the American Rule and applied it to declaratory judgment actions.

In light of the above, the question is whether the trial court found "special circumstances" to exist in this case so as to support the trial court's award of attorney's fees. The court did not address the existence of "special circumstances" as such. It did, however, alternatively base its award on "general equitable principles" and referred to the inconsistent positions taken by the defendants during the controversy and Universal's conduct during discovery in support of its award of attorney's fees.

■ Another exception to the "American Rule" is that attorney's fees may, on rare occasions, be recovered where a court of equity finds it necessary to award them in order to balance benefits, but this occurs only if "very unusual circumstances" can be shown. *Osterberger v. Hites Const. Co.,* 599 S.W.2d 221, 230 (Mo.App.1980); *Farley v. Johnny Londoff Chevrolet, Inc.,* 673 S.W.2d 800, 806 (Mo.App.1984); *Ohlendorf v. Feinstein,* 697 S.W.2d 553, 557–58 (Mo.App.1985).

■ No cases have been cited to us which extend this conduct into the realm of "special" or "very unusual" circumstances and we decline to do so here. The taking of inconsistent positions by parties to litigation is a common, if not tolerated, practice and hardly makes this a "very unusual" case or amounts to a "special circumstance". Rule 61.01 specifically provides the means, method and grounds for obtaining discovery sanctions. One party's alleged discovery misconduct does not justify an award of all pretrial attorney's fees against all defendants under the Declaratory Judgments Act.[3]

■ Although awards of attorney's fees are left to the broad discretion of the trial court and will not be overturned except for an abuse of discretion, this standard is based on the assumption that the court had the authority to award the fees. *Geary v. Geary,* 697 S.W.2d 318, 320 (Mo. App.1985). Because no special or unusual circumstances were shown, we hold that the court did not have the authority to award attorney's fees against all defendants in this declaratory judgment action.

■ Defendants also argue that the University may not collect attorney's fees because it failed to specifically ask for them in its prayer for relief. Because we have decided the attorney's fees question on the substantive issue, we need not address this procedural issue. However, our holding should make it clear that attorney's fees should not only be specifically prayed

---

**3.** A motion under Rule 56.01 for sanctions against Defendant Universal for attorneys fees in taking one deposition was pending at trial. However, the record before us does not indicate that any evidence of the fees and expense relating specifically to this motion was presented to the trial court.

for in declaratory judgment actions, but also the facts giving rise to such relief should be pleaded. Attorney's fees are special damages, *Miller v. Higgins*, 452 S.W.2d 121, 125 (Mo.1970), which must be specifically pleaded in order to be recovered. Rule 55.19. Generally, attorney's fees are not considered to be costs. *Wilkinson v. Wilkinson*, 546 S.W.2d 737, 738 (Mo.App.1977). And "costs" under § 527.100 do not necessarily include attorney's fees. *Mayor, supra*.

## THE "RIGGIN" MEMORANDA

 Defendants next argue that the trial court erred in admitting the "Riggin" memoranda into evidence. These were memoranda relating to inspections of the leased premises prepared by an engineer employed by Universal at the request of Universal's house counsel and corporate secretary, Linda Drake. Universal objected to the production and admission of these exhibits on the grounds that they constituted work product and were protected by the attorney-client privilege.

We do not need to reach the question of whether the memoranda were admissible. Even if they were admissible, there is no indication that the trial court relied extensively on them—in fact they are not mentioned in the trial court's findings except in the context of Universal's initial failure to produce them—and there was other evidence to support the trial court's judgment on the request for declaratory judgment and specific performance. "The admission of improper evidence is not ordinarily a ground for reversal in a nonjury case, at least where it did not appear to have played a critical role in the court's decision." *Gardner v. Robinson*, 759 S.W.2d 867, 868 (Mo.App.1988). In a court-tried case, a certain latitude is allowed in the admission of evidence. Except where the trial court relied on inadmissible evidence in arriving at its findings, such evidence is ordinarily held to be nonprejudicial. *Id.* Other competent evidence supports the judgment of the trial court. There was no prejudicial error in the admis-

sion of the Riggin memoranda. Point VIII is denied.

Defendants also cite as error a pretrial ruling ordering the "Riggin" memoranda produced for discovery. To prevail, defendants must show that they were prejudiced at trial by the erroneous and prejudicial admission of the evidence compelled to be produced. As we have already held, there was no prejudicial error in the admission of the "Riggin" memoranda. Point IX is denied.

The portion of the judgment granting declaratory relief and specific performance is affirmed; the portion of the judgment awarding attorney's fees and expenses is reversed.

REINHARD, P.J., and STEPHAN, J., concur.